Joann LEWIS and James F. Lewis,
Husband and Wife, Plaintiffs–
Appellees,

Marjorie L. Wolf, Plaintiff,

v.

The SAC AND FOX TRIBE OF OKLA-
HOMA HOUSING AUTHORITY, a/k/a
The Housing Authority of the Sac and
Fox Tribe of Indians of Oklahoma, a/k/a
Housing Authority of the Sac & Fox
Nation, a/k/a Sac and Fox Indian Hous-
ing Authority of Oklahoma, Defendant–
Appellant.

No. 78825.

Supreme Court of Oklahoma.

Feb. 9, 1994.

Rehearing Denied June 15, 1995.

L. Susan Work, Seminole, for defendant-appellant.

Douglas L. Combs, Shawnee, for plaintiffs-appellees.

OPALA, Justice.

The two issues presented by this appeal are: [1] Has Congress affirmatively ousted state courts of their concurrent jurisdiction to entertain contract actions involving land transactions between Indian buyers and *state-created Indian housing authorities?* and if not [2] Do the terms of the Mutual Help and Occupancy Agreement between the Indian plaintiffs and the state-created Indian housing authority express an intent to convey both the surface and mineral estates to the plaintiffs? We answer the *first* question in the *negative* and the *second* in the *affirmative.*

## I

### THE ANATOMY OF LITIGATION

The Sac and Fox Nation [Tribe] is a federally recognized sovereign Indian tribe. In 1789 the Tribe entered into its first treaty with the United States and ceded much of its land.[1] A treaty-imposed migration followed over a number of years, as a result of which the Tribe eventually settled in 1867 at its final destination on the Sac and Fox Reservation in Indian Territory.[2] In response to white settlers' demands for land, Congress entered into a treaty designed to implement the provisions of the Dawes Act.[3] This treaty allowed the Tribe to retain 800 acres. Within the boundaries of that land, each

1. Treaty at Fort Harmar, 7 Stat. 28; *Oklahoma Tax Com'n v. Sac and Fox Nation*, 508 U.S. ——, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).

2. M. Wright, *A Guide to the Indian Tribes of Oklahoma*, 225–6 (1951).

3. The Dawes Act, also called the General Allotment Act, 24 Stat. 388, provided for allotting reservation land to individual tribal members and purchasing the surplus for white settlers.

tribal member had the right to choose an allotment of one-quarter section. Congress ratified the treaty in 1891.[4]

The United States Housing Act of 1937 [1937 Act] ushered in the Low Rent Public Housing Program to assist states in remedying unsafe and unsanitary housing conditions plaguing low-income strata.[5] The 1937 Act, which also provided a statutory basis for furnishing low-cost housing to Indians,[6] was not implemented by the United States Department of Housing and Urban Development [HUD] until 1962. It was then that HUD made the program specifically available for Indian Country[7] and promulgated regulations directly affecting the creation and administration of Indian housing authorities [IHA].[8] These regulations give the Indian tribes the opportunity to *establish an IHA through the framework of either tribal or state law.*[9] *Our Legislature enacted the Oklahoma Housing Authorities Act*[10] *which authorizes the creation of local IHAs and makes them state agencies.*[11]

In conformity with the Oklahoma Act the Housing Authority of the Sac and Fox Tribe of Oklahoma [Authority] was created in 1966.[12] It provides low-income housing for tribal members and for other Indians with the use of HUD funds. *In 1983 the Authority was reorganized under tribal law.*[13] Because the Tribe's IHA had not received HUD approval for operating under the tribal law of 1983—a step needed to receive federal fund-ing—*the Authority continued its existence as a state agency under the Oklahoma Act. It acquired fee simple title to the property here in contest in 1974 by warranty deed from non-Indian owners.* The deed imposes no restriction on ownership. *The property, which is located in the city limits of Shawnee, Oklahoma, had originally been a Kickapoo Indian allotment.*[14] The site was designated as housing Project 90–05.

The appellees, Joann and James F. Lewis [collectively called Lewis], *who are tribal members,* entered on December 22, 1974 into a Mutual Help and Occupancy Agreement [MHO Agreement] with the Authority. Pursuant to this contract Lewis' home was constructed on the project site. They were advised this home would be paid off on September 1, 1990 and title would then pass to them. By warranty deed the Authority did convey to Lewis *surface rights only, reserving unto itself the oil and gas and other mineral rights underlying the property.*

In this suit Lewis sought *specific performance* of the MHO contract and an accounting for all oil and gas revenues the Authority received since the date of the conveyance. The Authority *objected* both to the district court's *in rem* and *in personam* jurisdiction. Its challenge to state-court jurisdiction rested on a two-prong attack: (a) the sovereign-immunity status of the housing authority[15] and (b) the project's claim as a "dependent Indian community" within the definition of

---

4. 26 Stat. 750–751.

5. 42 U.S.C. § 1437 (1988).

6. Staff of Senate Comm. on Interior and Insular Affairs, 94th Cong., 1st sess., Report on the Indian Housing Effort in the United States with Selected Appendices 3 (Comm.Print 1975).

7. *Id.; see also* Mark K. Ulmer, *The Legal Origin and Nature of Indian Housing Authorities and the HUD Indian Housing Programs,* 13 Am.Indian L.Rev. 109, 110 (1988).

8. 24 C.F.R. §§ 905.101–905.950 (1990).

9. 24 C.F.R. §§ 905.125–26 (1991).

10. 63 O.S.1981 §§ 1051 et seq.

11. The pertinent terms of 63 O.S.1981 § 1057 provide that IHAs established under the Oklahoma Housing Authorities Act *"shall be an agency of the State* of Oklahoma, possessing all pow-ers, rights, and functions herein specified for city and county authorities created pursuant to this act * * *."* (Emphasis added.)

12. By tribal resolution (SF–66–4) of November 20, 1965, the Sac and Fox Tribe of Oklahoma authorized the Authority to transact business and exercise powers pursuant to the Oklahoma Housing Authorities Act, *supra* note 10.

13. Sac and Fox Housing Authority Act of 1983, Resolution SF–83–25. Section 302 of this act allows the Authority to waive its sovereign immunity and designates the tribal court as the forum in which the housing authority is to be sued. *At the time of trial HUD had not given a final agency approval for the 1983 Act.*

14. The property was later sold to a non-Indian owner. *The Authority acquired fee simple title from the land's non-Indian owner, who held it without any restrictions on Indian ownership.*

"Indian Country".[16] The trial court denied the Authority's quest for the action's dismissal (for want of subject matter jurisdiction), ruling that, at the time of the parties' contract, the land in question was not within "Indian Country". After a bench trial the nisi prius court gave judgment to Lewis, directing the Authority to convey to them its title to the mineral interest in contest.[17] The Authority brings this appeal.

## II

## OUTSIDE THE FRAMEWORK OF PUBLIC LAW 83–280 THERE IS A "WINDOW OF OPPORTUNITY" FOR STATES TO ADJUDICATE MIXED QUESTIONS OF STATE/FEDERAL/TRIBAL LAW, WHEN THE EXERCISE OF THEIR JURISDICTION DOES NOT INFRINGE UPON TRIBAL SELF-GOVERNMENT

■ In 1953, Congress promulgated Public Law 83–280 [hereinafter PL–280] to provide a method for the states to assume criminal and/or civil jurisdiction over "Indian Country".[18] As originally proposed, PL–280 allowed states to assume cognizance without the consent of an affected tribe.[19] As part of the Indian Civil Rights Act of 1968,[20] Congress amended PL–280 to require that the state take some affirmative action when opting to extend its jurisdiction to Indian Country.[21] A state may assert cognizance over Indian Country *only* if the enrolled Indians have given their consent by tribal referendum.[22]

■ The U.S. Supreme Court has continued to emphasize the congressional policy of fostering tribal autonomy as a guiding light in allocating jurisdiction to courts in states that have not complied with PL–280.[23] In *Kennerly v. District Court,*[24] the Court withheld from Montana concurrent state jurisdiction over Indian Country. There, two mem-

15. On appeal the Authority abandoned its sovereign immunity challenge, see *infra* note 59.

16. "Indian Country" includes "dependent Indian communities" defined in 18 U.S.C. § 1151 as follows:

"... (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state...."

17. The scheduling order below indicates the cause was to be reached for "trial by jury." According to the pre-trial conference order the parties had agreed to "waive the jury." Since both claims—that for specific performance as well as that for accounting—are of equitable cognizance, the "waiver" does not appear to have been necessary. *McCraw v. Richardson.,* Okl., 459 P.2d 620, 623 (1969) (specific performance); *Fleet v. Sanguine, Ltd.,* Okl., 854 P.2d 892, 896 n. 17 (1993) (equitable accounting).

18. "Indian Country" refers to a broad definition found in 18 U.S.C. § 1151, *supra* note 16, which includes "formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." *Sac and Fox Nation, supra* note 1. Although § 1151 defines Indian Country for application to the exercise of federal criminal jurisdiction, its terms extend to civil jurisdiction as well. *Indian Country, U.S.A. v. Oklahoma Tax Com'n,* 829 F.2d 967, 973 (10th Cir.1987) (*citing California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207, 107 S.Ct. 1083, 1087 n. 5, 94 L.Ed.2d 244 (1987)).

19. *State ex rel. May v. Seneca–Cayuga Tribe,* Okl., 711 P.2d 77, 86 (1985).

20. 25 U.S.C. §§ 1321 et seq.

21. Because Oklahoma did not take the appropriate steps to take jurisdiction under PL–280, the proper inquiry to be made in this case must focus upon the congressional policy of fostering tribal autonomy in the light of pertinent U.S. Supreme Court jurisprudence. *Ahboah v. Housing Authority of Kiowa Tribe,* Okl., 660 P.2d 625, 629 n. 19 (1983).

22. "Indian Civil Rights Act of 1968", Act of April 11, 1968, PL 90–284, 82 Stat. 77 (codified as amended at 25 U.S.C. §§ 1301, 1302, and 1303 (1982)).

23. *South Dakota v. Bourland,* 508 U.S. ——, 113 S.Ct. 2309, 2319, 124 L.Ed.2d 606 (1993); *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico,* 458 U.S. 832, 838, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982); *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142–145, 100 S.Ct. 2578, 2583–2584, 65 L.Ed.2d 665 (1980).

24. *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971) (*per curiam* ).

bers of the Blackfeet Tribe were sued in state court on a debt for food bought from a grocery store located on private land *within the exterior boundaries of the reservation.* The Court concluded that Montana had not complied with the terms of PL–280, because the state never took affirmative legislative action to assume *civil jurisdiction over the Blackfeet Reservation.*[25]

*Kennerly,* which relies upon the teachings of *Williams v. Lee*[26] that "absent governing Acts of Congress, the question has always been whether the state action infringed upon the right of the reservation Indians to make their own laws and be ruled by them,"[27] does not stand as authority defeating concurrent state jurisdiction *in all civil cases.* Its thrust "is concerned solely with the procedural mechanisms by which tribal consent must be registered."[28]

Another case from Montana, *Fisher v. District Court,*[29] stressed the overriding congressional policy of fostering tribal self-government.[30] There, while concurrent state cognizance was found inappropriate, the Court reiterated that the paramount test calls for a preliminary inquiry into whether assumption of jurisdiction would infringe upon tribal self-government. The Court reasoned that tribal courts provide the appropriate forum for settlement of those disputes over personal and property interests of Indians which *arise out of tribal relationships.*[31] The teachings of *Kennerly* and *Fisher* do not

divest state courts of cognizance over all disputes among Indians. *Where, as here, state law is implicated, governs the transaction and is invoked, and there is no infringement upon tribal self-government, there can be no barrier to state cognizance.*

The U.S. Supreme Court's jurisprudence clearly supports the notion that not every controversy affecting Indians and their lands lies outside state-court jurisdiction.[32] In *Oklahoma Tax Commission v. Graham*[33] the Court held recently that a tribal sovereign immunity counterclaim, pressed in a state-court suit to enforce a tax assessment against an Indian tribe for its cigarette sales and bingo receipts, *is not removable to a federal forum;* it remains cognizable in a state court. In *Cotton Petroleum Corp. v. New Mexico*[34] the Court similarly held that unless preempted by federal law, New Mexico can tax on-reservation production of oil and gas by non-Indian lessees.[35]

In sum, whenever Indian interests are tendered in a controversy, a state court must make a preliminary inquiry into the nature of the rights sought to be settled.[36] Only that litigation which is explicitly withdrawn by Congress or that which infringes upon tribal self-government stands outside the boundaries of permissible state-court cognizance. With this test in mind, we revisit today extant Oklahoma jurisprudence on

---

**25.** *Kennerly, supra* note 24, 400 U.S. at 425, 91 S.Ct. at 482.

**26.** *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

**27.** *Williams, supra* note 26, 358 U.S. at 220, 79 S.Ct. at 271.

**28.** *Kennerly, supra* note 24, 400 U.S. at 430, 91 S.Ct. at 483. If states can *only* assume civil jurisdiction by complying with the terms of PL–280, Indian tribes must choose between exclusive state court jurisdiction and exclusive tribal court jurisdiction. *Id.,* 400 U.S. at 431, 91 S.Ct. at 485 (Stewart, J., dissenting).

**29.** *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) *(per curiam).* In *Fisher* the custodians of an Indian child commenced an adoption proceeding in state court. Relying on a federal statute, 25 U.S.C. § 372a, the Montana Supreme Court recognized concurrent state and tribal jurisdiction over adoption of Indians. The Court pronounced that state-court cognizance infringed upon tribal self-government

and held Montana divested of her concurrent jurisdiction.

**30.** *Id.,* 424 U.S. at 388, 96 S.Ct. at 947.

**31.** *Fisher, supra* note 29; *Williams, supra* note 26.

**32.** *See, e.g., Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 175, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989); *Oklahoma Tax Commission v. Graham,* 489 U.S. 838, 109 S.Ct. 1519, 1521, 103 L.Ed.2d 924 (1989) *(per curiam).*

**33.** *Supra* note 32.

**34.** *Supra* note 32.

**35.** *See* discussion of the distinction between federal pre-emption concept and the congressional ouster-of-jurisdiction doctrine in Part III(A), *infra.*

**36.** For a case where a court failed to take into consideration the character of relationship which

the constitutional state/federal allocation of judicature.[37]

In *Housing Authority of the Seminole Nation v. Harjo*,[38] a case which followed the path pursued by *Ahboah v. Housing Authority of Kiowa Tribe*,[39] this court concluded and proceeded on the assumption that *all* litigation among Indians lies *dehors* state-court jurisdiction. Its plainly overbroad statement resulted in excessive self-abnegation of power and a wholesale retreat from judicature that does not accord with the constitutional principles we analyze and explain today in Part III, *infra.*

## III

## OUSTER OF STATE–COURT JURISDICTION

### A.

*Under This Nation's Dual Sovereignty Scheme And Dual Court System, State Courts Lose Their Concurrent Jurisdiction Only When Ousted By An Explicit Congressional Directive*

The Authority asserts that state courts have *no* jurisdiction over contract actions involving lands in Indian Country, regardless of the property's status when the sale took place. For this principle the Authority relies on Oklahoma jurisprudence, *Ahboah*[40] and *Harjo.*[41] We now reject the notion of an all-inclusive congressional ouster as an incorrect exposition of the pertinent constitutional principles.

 Our specific task today calls for an inquiry into whether Oklahoma courts stand *ousted* of *their concurrent* jurisdiction over this contract action by Indian plaintiffs against a state-created IHA. Under our system of federalism, a state's sovereignty is concurrent with that of the federal government, subject only to limitations imposed by the Supremacy Clause.[42] *Yellow Freight System, Inc. v. Donnelly*[43] teaches that "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the

would confer state-court cognizance, see *State ex rel. Joseph v. Redwing*, 429 N.W.2d 49 (S.D.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2071, 104 L.Ed.2d 636 (1989). There, a court held it had subject matter jurisdiction to establish the amount of and to enforce a child support obligation, even though a tribal court had dissolved the Indian marriage and ordered the father to pay child support (apparently without setting the quantum of obligation).

37. *Ahboah, supra* note 21; *Housing Authority of the Seminole Nation v. Harjo*, Okl., 790 P.2d 1098 (1990).

38. *Supra* note 37. Relying upon a mechanical analysis of "Indian Country," *Harjo* holds that an Oklahoma court has *no* authority to adjudicate a forcible entry and detainer action arising from tenancy in Indian Country.

39. *Supra* note 21. *Ahboah* holds that a state court cannot entertain jurisdiction over a forcible entry and detainer proceeding against the beneficial owner of a trust allotment *in lands located within Indian Country.*

40. *Supra* note 21.

41. *Supra* note 37.

42. Art. 6, cl. 2, U.S. Const. Justice Scalia discusses the constitutional underpinnings for the dual sovereignty concept in his concurring opinion in *Tafflin v. Levitt*, 493 U.S. 455, 469, 110 S.Ct. 792, 800–801, 107 L.Ed.2d 887 (1990), where he says:

"State courts have jurisdiction over federal causes of action not because it is 'conferred' upon them by the Congress; nor even because their inherent powers permit them to entertain transitory causes of action arising under the laws of foreign sovereigns, see, *e.g.*, *McKenna v. Fisk*, 1 How. 241, 247–249, 11 L.Ed. 117 (1843); but because '[t]he laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are.... The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other....' *Claflin v. Houseman*, 93 U.S. 130, 136–137, 23 L.Ed. 833 (1876); see also *Minneapolis & St. Louis R. Co. v. Bombolis*, 241 U.S. 211, 221–223, 36 S.Ct. 595, 598–599, 60 L.Ed. 961 (1916).

United States."[44] "To give federal courts exclusive jurisdiction over a federal cause of action, Congress must, in an exercise of its powers under the Supremacy Clause, affirmatively divest state courts of their presumptively concurrent jurisdiction."[45] In *Gulf Offshore v. Mobil Oil* the Court identified three different methods by which a congressional state-court ouster may be effected[46]—(1) by an explicit statutory directive,[47] (2) by unmistakable implication from legislative history, or (3) by a clear incompatibility between state-court jurisdiction and federal interests.[48]

▆▆▆▆ The constitutional ouster-of-jurisdiction doctrine is not to be confused with federal preemption. Preemption occurs when federal law *displaces* a body of state law on the same subject. Unlike state-court ouster, which requires that we examine the

> It therefore takes an affirmative act of power under the Supremacy Clause to oust the States of jurisdiction—an exercise of what one of our earliest cases referred to as 'the power of congress to *withdraw*' federal claims from state-court jurisdiction. *Houston v. Moore,* 5 Wheat. 1, 26, 5 L.Ed. 19 (1820) (emphasis added). See also *Bombolis, supra,* 241 U.S., at 221, 36 S.Ct., at 598 (concurrent jurisdiction exists 'unless excepted by express constitutional limitation or by valid legislation'); *Missouri ex rel. St. Louis, B. & M.R. Co. v. Taylor,* 266 U.S. 200, 208, 45 S.Ct. 47, 48, 69 L.Ed. 247 (1924) ('As [Congress] made no provision concerning the remedy, the federal and the state courts have concurrent jurisdiction')."

**43.** 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990).

**44.** *Yellow Freight, supra* note 43, 494 U.S. at 823, 110 S.Ct. at 1568 (quoting from *Tafflin, supra* note 42, 493 U.S. at 458–460, 110 S.Ct. at 795, and citing *Claflin v. Houseman,* 93 U.S. 130, 136–137, 23 L.Ed. 833 (1876), and *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 477–478, 101 S.Ct. 2870, 2874–2875, 69 L.Ed.2d 784 (1981). *See also Houston v. Moore,* 5 Wheat. 1, 25–26, 5 L.Ed. 19 (1820); *Plaquemines Tropical Fruit Co. v. Henderson,* 170 U.S. 511, 517, 18 S.Ct. 685, 688, 42 L.Ed. 1126 (1898); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 507–508, 82 S.Ct. 519, 522–523, 7 L.Ed.2d 483 (1962).

**45.** *Yellow Freight, supra* note 43, 494 U.S. at 823, 110 S.Ct. at 1568 (quoting from *Tafflin, supra* note 42, 493 U.S. at 458–460, 110 S.Ct. at 795). "This deeply rooted presumption in favor of concurrent state court jurisdiction *is … rebutted if Congress affirmatively ousts the state courts of jurisdiction* over a particular federal claim." *Tafflin, supra* note 42, 493 U.S. at 458–460, 110 S.Ct. 792 at 795. *Gulf Offshore, supra* note 44, teaches that "[i]n considering the propriety of state-court jurisdiction over any particular federal claim, the Court begins with the presumption that state courts enjoy concurrent jurisdiction. Congress, however, may confine jurisdiction to the federal courts either explicitly or implicitly." *Id.,* 453 U.S. at 478, 101 S.Ct. at 2875 (emphasis added).

**46.** *Gulf Offshore, supra* note 44, 453 U.S. at 478, 101 S.Ct. at 2875; *Tafflin, supra* note 42, 493

U.S. at 458–460, 110 S.Ct. at 795. The Court has suggested that the factors identified in *Gulf Offshore, supra* note 44, are the *sole* means of resolving a claim to exclusive federal-court jurisdiction. *See Hathorn v. Lovorn,* 457 U.S. 255, 266, 102 S.Ct. 2421, 2428, 72 L.Ed.2d 824 (1982) ("Only … [the *Gulf Offshore* factors] will rebut the presumption [of concurrent jurisdiction]").

**47.** In *Tafflin, supra* note 42, Justice Scalia observes that "[i]n the standard fields of exclusive federal jurisdiction, the governing statutes specifically recite that suit may be brought 'only' in federal court, Investment Company Act of 1940, as amended, 84 Stat. 1429, 15 U.S.C. § 80a–35(b)(5); that the jurisdiction of the federal courts shall be 'exclusive,' Securities Exchange Act of 1934, as amended, 48 Stat. 902, 15 U.S.C. § 78aa; Natural Gas Act of 1938, 52 Stat. 833, 15 U.S.C. § 717u; Employee Retirement Income Security Act of 1974, 88 Stat. 892, 29 U.S.C. § 1132(e)(1); or indeed even that the jurisdiction of the federal courts shall be 'exclusive of the courts of the States,' 18 U.S.C. § 3231 (criminal cases); 28 U.S.C. §§ 1333 (admiralty, maritime and prize cases), 1334 (bankruptcy cases), 1338 (patent, plant variety protection, and copyright cases), 1351 (actions against consuls or vice consuls of foreign states), 1355 (actions for recovery or enforcement of fine, penalty, or forfeiture incurred under Act of Congress), 1356 (seizures on land or water not within admiralty and maritime jurisdiction)." *Id.,* 493 U.S. at 469, 110 S.Ct. at 801–802 (Scalia, J., concurring).

**48.** Justice Scalia observes in *Tafflin, supra* note 42, that:

> "It is perhaps also true that implied preclusion can be established by the fact that a statute expressly mentions only federal courts, plus the fact that state-court jurisdiction would plainly disrupt the statutory scheme. That is conceivably what was meant by the third part of the *Gulf Offshore* dictum, 'clear incompatibility between state-court jurisdiction and federal interests.' … If the phrase is interpreted more broadly than that, however—if it is taken to assert some power on the part of this Court to exclude state-court jurisdiction when systemic federal interests make it undesirable—it has absolutely no foundation in our precedent." *Id.,* 493 U.S. at 469, 110 S.Ct. at 801 (Scalia, J., concurring).

law for the presence of an "explicit statutory directive" conferring *exclusive* federal-court jurisdiction, preemption is a *matter of congressional intent,*[49] which may be effected even by regulations of a federal agency acting within the scope of congressionally delegated authority.[50] *Preemption alone* cannot divest state courts of jurisdiction to entertain federal-law claims.

Because *Ahboah*[51] and *Harjo*[52] both failed to take into account the constitutional underpinnings for the concurrent state-court jurisdiction analysis, we may today reassess the nisi prius cognizance of the present cause free from the binding force of precedential restraint. It is fitting for us to revisit here the congressional ouster notions and infuse our law with *Yellow Freight's* teaching that *a state court has constitutionally invested authority over any claim or issue affected or regulated by federal law, which is not expressly withheld from its jurisdiction by an act of Congress.*

▮▮ The Authority has directed our attention to the 1937 Act,[53] but we find nothing in that enactment which would suggest that Congress has, by some explicit statutory directive, ousted the state courts of cognizance over *contract disputes between state-created IHAs and their Indian project participants.* The 1937 Act clearly authorizes the establishment of IHAs *in conformity to state law* for the purpose of providing low-income housing projects for Indians.[54] Nor are we aware of any legislative history that Congress by "unmistakable implication" intended to assign IHA-spawned disputes with Indian purchasers *only* to federal courts.[55] We next inquire into whether "state-court jurisdiction over Indians or activities on Indian lands *would interfere with tribal sovereignty and self-government.*"[56] In those instances, the Court advises, "the state courts are generally *divested of jurisdiction as a matter of federal law.*"[57] Although in its petition in error the Authority relied for reversal on sovereign immunity of the Tribe, it has not argued that issue on appeal.[58] In fact, the Authority's reply brief informs us that its challenge on that point has been abandoned.[59]

---

**49.** Preemption may occur in four distinct instances: (1) by express statutory language; (2) by a pervasive regulatory scheme which infers the presence of congressional intent that the federal regulation did not need supplemental state-law provisions; (3) when an actual conflict between state and federal laws makes it impossible to comply with both; or (4) where the objectives and purposes of Congress are thwarted by state law. *Todd v. Frank's Tong Service, Inc.,* Okl., 784 P.2d 47, 49 (1989); *Missouri–Kansas–Texas R. Co. v. State,* Okl., 712 P.2d 40, 47 (1985).

**50.** *City of New York v. F.C.C.,* 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988); *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982).

**51.** *Ahboah, supra* note 21.

**52.** *Harjo, supra* note 37.

**53.** For a discussion of the 1937 Act, see *supra* note 5 and accompanying text.

**54.** The terms of 24 C.F.R. § 905.125 (1990) are:

"An IHA may be established pursuant to a State law that provides for the establishment of IHAs with all necessary legal powers to carry out low-income housing projects for Indians."

**55.** *Gulf Offshore, supra* note 44, 453 U.S. at 478, 101 S.Ct. at 2875.

**56.** *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 15, 107 S.Ct. 971, 976, 94 L.Ed.2d 10 (1987) (citing *Fisher, supra* note 29, and *Williams, supra* note 26).

**57.** *LaPlante, supra* note 56, 480 U.S. at 15, 107 S.Ct. at 976.

**58.** Claims to error for which there is no support in argument and authority are deemed abandoned. *Hadnot v. Shaw,* Okl., 826 P.2d 978, 981 (1992); *Holbert v. Echeverria,* Okl., 744 P.2d 960, 962 n. 4 (1987); *Peters v. Golden Oil Co.,* Okl., 600 P.2d 330, 331 (1979); *Harley v. Jobe,* 207 Okl. 296, 249 P.2d 468, 469 (1952).

**59.** The Authority states that all issues relating to the sovereign immunity of the Tribe were abandoned because of the "confusion in the record" concerning its status as a tribal agency. *The Authority explains that HUD failed to recognize it as an agency operating under tribal rather than state law.*

By its mid-appeal brief the Authority informs this court *that HUD had approved its 1993 amendment of the 1983 Sac and Fox Indian Housing Authority Act.* According to the Authority, the 1993 version provides that the Authority "shall be an *agency of the Sac and Fox Nation* of Oklahoma having the purposes, powers and duties ... as established by law." (Emphasis added.) This change, the Authority urges, supports its argument that the contested property lies in Indian Country and that its reservation of the miner-

Because the Authority has failed to overcome the U.S. Constitution's presumption that state courts have jurisdiction, concurrent with federal courts, to hear claims arising under the 1937 Act, we affirm the trial court's ruling that upholds its subject matter cognizance over these Indian purchasers' claim to title. Today's pronouncement is not to be understood as a broad declaration that *all* litigation of Indian rights lies within the inherent constitutional cognizance of Oklahoma state courts. We *only hold that, when measured by the Gulf Offshore analysis, state-court settlement of this controversy does not contravene any federal policy, either constitutional or statutory.*

## IV

### THE DOCUMENT IN CONTEST—THE PARTIES' MHO AGREEMENT—IS A CONTRACT TO CONVEY THE ENTIRE FEE UPON FULL PERFORMANCE OF ITS TERMS

### A.

### *The Oklahoma Law of Conveyancing, Rather Than Tribal Law, Governs The Settlement Of This Dispute*

The Authority requested that the trial court take judicial notice [60] of four tribal laws which had been filed with its pre-trial brief.[61] Pertinent here is a 1987 amendment to the 1983 Sac and Fox Housing Authority Act. The 1987 law *requires* the Authority to *retain* title to any mineral interest acquired by it in fee simple and to deposit all revenues and proceeds derived from that interest into a special account for tribe-related purposes.[62] The Authority asserts that its construction of the MHO Agreement [63]—as calling for a conveyance of a surface estate to Lewis and for the mineral interest's reservation by the Authority—is in compliance with the 1987 tribal law.

---

al interest accords with applicable federal law and regulations. As we view the mid-appeal development, it has no legal effect on the *rights* in contest. State-court jurisdiction attached to this claim at the time it first came before the court. *Amarex, Inc. v. Sell*, Okl., 566 P.2d 456, 459 (1977); *Jones Drilling Company v. Woodson*, Okl., 509 P.2d 116, 118 (1973).

**60.** Taking judicial notice means *only* that we may *dispense with proof* of some norm of state and federal law—common, constitutional, or statutory law—of which the court may be advised *sans* proof. The terms of 12 O.S.1991 § 2201(A) require us to take "judicial notice" of law *that is invoked* in the adversary process. The terms of § 2201(A) are:
"Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States."

**61.** Those laws are: (1) Sac and Fox Resolution 66–4, which creates the Housing Authority; (2) Sac and Fox Housing Authority Act of 1983, which designates the Authority as "an agency" of the Sac and Fox Tribe; (3) Sac and Fox Resolution 86–51, which relates to judicial resolution of disputes involving the Housing Authority; and (4) Sac and Fox Resolution 87–75, which adds § 306 to the 1983 Sac and Fox Housing Authority Act.

**62.** The 1987 tribal resolution adds § 306 to the Sac and Fox Housing Authority Act as established January 21, 1983. Lewis did not object

below to nisi prius notice of the 1987 resolution, which the Authority had attached to its pre-trial brief. The pertinent terms of § 306 are:

"MINERAL INTERESTS IN REAL PROPERTY
(a) Title to any mineral interests, including oil and gas interest, acquired by the Authority, in fee simple, due to its acquisition of real property by purchase, gift, or otherwise is hereby declared to be and is severed and vested in the Housing Authority of the Sac and Fox Tribe of Indians of Oklahoma, and the Authority shall make such its conveyances of real property in such form as may be necessary to clarify such severance and vesting of title in the record."

\* \* \* \* \* \*

(c) All revenues and proceeds derived from said mineral interest shall be deposited in a special account maintained by the authority for the following purposes:
(1) operational expenses of the Housing Authority, or
(2) improvements or additions, including repairs, to existing projects,
(3) construction or acquisition of new projects.
(d) A conveyance of mineral interests other than as authorized in Subsection (b) of this section may be made only with the consent of the Sac and Fox Business Committee. \* \* \* "

**63.** For a discussion of the Lewis/Authority MHO Agreement, see Part I, *supra*.

One who asserts that a law different from that of Oklahoma governs the dispute bears the burden of identifying and invoking that other law. Unless foreign law is invoked, Oklahoma's domestic law will be deemed to govern.[64] *We agree with the trial court and hold that the Oklahoma contract law and that of conveyancing, rather than tribal law, is applicable to this claim by the Indian purchasers.* The trial court ruled that (1) when Lewis entered into the 1974 MHO Agreement the project land was *not situated within a dependent Indian community* and was not otherwise constituted as Indian Country, and (2) the MHO Agreement was executed *before* the Tribe reorganized the Authority in 1983 as a tribal agency.[65] *Both at the time of the property's tribal acquisition as well as of the Lewis contract's execution, the Authority was operating as a state agency under the Oklahoma Housing Authorities Act.*[66] *The Sac and Fox law, which had initially created the Tribe's Housing Authority under the state act, had neither been repealed nor revoked. It stood in full force and effect when the property was acquired by the Indian housing agency and when it was sold to Lewis.*

In short, when the parties entered into the MHO Agreement, the project area involved was not, as the trial court correctly ruled, a "dependent Indian community".[67] Neither was the project site Indian Country when the Authority conveyed the premises to Lewis. We hence hold that, for the reasons *further* explained later in this opinion, state contract law and that of conveyancing, rather than tribal law, is applicable to the MHO Agreement in contest and to the title claim of these Indian purchasers.

When construing the phrase *dependent Indian community*, the U.S. Court of Appeals for the Tenth Circuit must take into account "the nature of the area in question, the relationship of the inhabitant of the area to Indian tribes, and to the federal government, and the established practice of government agencies toward the area."[68] A more elaborate set of factors was identified by the Eighth Circuit in *United States v. South Dakota*[69]—i.e., (1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and authority to enact regulations and protective laws respecting this territory; (2) the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area; (3) whether there is an element of cohesiveness manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality; and (4) whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.[70] *The ultimate test is whether the land is set apart for the use of Indians under the superintendence of the federal government.*[71]

The trial court concluded that the *property in contest was not an independent Indian community* when the contract was executed in 1974. *This is so because at that time the provisions of tribal health, police, social and food services were not in effect.* We agree with the trial court's analysis and its reasoning. *When title passed from the Authority to Lewis, the property was not Indian Country.* At this point HUD's oversight (*via* its extensive federal regulations of MHO programs) came to an end. Lewis had performed all the obligations imposed by the

---

64. *Benham v. Keller*, Okl., 673 P.2d 152, 153 (1983).

65. According to the Authority Director, HUD approval is not required to infuse validity into tribal housing laws; it is only necessary to receive funding.

66. *Supra* note 11.

67. For the definition of "dependent Indian community", see 18 U.S.C. § 1151(b), *supra* note 16.

68. *United States v. Martine*, 442 F.2d 1022, 1023 (10th Cir.1971).

69. 665 F.2d 837 (8th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982).

70. *South Dakota, supra* note 69 at 841–843.

71. *United States v. Pelican*, 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914).

MHO Agreement when the Authority executed its warranty deed. Because we can find *no* basis for applying tribal law to this dispute, we proceed to construe these Indian purchasers' rights in accordance with Oklahoma law.

## B.

### *Rules for Construing A Contract To Convey Real Property*

Whether a contract is ambiguous so as to require extrinsic evidence to clarify the doubt is a question of law for the courts.[72] If language of a contract is clear and free of ambiguity, the court is to interpret it as a matter of law.[73]

At the conclusion of the trial, the nisi prius court informed the parties that the controlling legal issue was whether the definition of the critical word "grounds" (inserted into the MHO Agreement) includes a mineral interest.[74] The court directed the parties to submit post-trial briefs. Neither Lewis nor the Authority objected to briefing this issue as one of law, either at trial or in their post-trial submissions. By their conduct the parties clearly manifested a desire to have the contract terms interpreted as a matter of law, rather than in the light of some intent to be gathered from extraneous evidence and circumstances. The contract's meaning tendered to the trial court was to be divined from the four corners of the instrument.[75]

A contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context.[76] *The language in a contract is given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept.*[77] The parol evidence rule teaches that unless fraud or mistake is involved, pre-contract negotiations and oral discussions are merged into, and superseded by, the terms of an executed writing.[78] The *practical* construction of an agreement (to be derived from the acts and conduct of the parties) is an available tool *only* in case ambiguity appears to be present. *Where, as here, a contract is complete in itself and, when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the instrument.* Because the parties proceeded on the premise the issue before the court was one of law, and nowhere interposed an objection to that notion, we hold them bound by their nisi prius positional commitment.

## C.

### *The Term "Grounds" In The MHO Agreement Includes Both The Surface and Mineral Estate*

The Authority asserts that from a four-corners' examination of the MHO

---

**72.** *Cook v. Oklahoma Bd. of Public Affairs,* Okl., 736 P.2d 140, 145 (1987); *Mercury Inv. Co. v. F.W. Woolworth Co.,* Okl., 706 P.2d 523, 529 (1985); *Ollie v. Rainbolt,* Okl., 669 P.2d 275, 279 (1983); *Ferrell Const Co., Inc. v. Russell Creek Coal Co.,* Okl., 645 P.2d 1005, 1007 (1982).

**73.** *Mercury, supra* note 72 at 529.

**74.** The trial judge asked the lawyers to tell him whether the word "grounds" is "a legal synonym for the term 'real estate' or 'real property'," or whether it "has a restricted meaning".

**75.** For our statutory rules for the construction of contracts, *see* 15 O.S.1991 §§ 151–157. The terms of § 153 are:
"For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this chapter are to be applied."

**76.** 15 O.S.1991 § 157; *Mercury, supra* note 72 at 529.

**77.** 15 O.S.1991 § 160; *Mercury, supra* note 72 at 529.

**78.** 15 O.S.1991 §§ 137, 155; *Mercury, supra* note 72 at 529. Under the terms of § 137, referred to generally as the parol evidence rule, testimonial evidence may be admissible to vary or contradict the terms of a written contract when fraud, accident or mistake is relied upon for relief from the binding effect of a contract. *Snow v. Winn,* Okl., 607 P.2d 678, 682 (1980); *Dewberry v. Yellow Manufacturing Acceptance Corp.,* Okl., 396 P.2d 522, 524 (1964); *Lone Star Gas Company v. Oakman,* Okl., 283 P.2d 810, 813–814 (1955). Here, the parties have not relied upon fraud, accident or mistake to vary the written terms of the document.

Agreement it is apparent there was to be a severance of the surface and mineral estates upon the completion of the contract's terms. The critical terms, relied on by the Authority, provide that when the purchasers have paid back all Authority-borrowed money, "the Authority will convey to the Participant *all of its interest in his house and grounds.*" The term "grounds", when considered in the context of the entire MHO Agreement, the Authority argues, calls for conveying to Lewis *but a surface estate* while reserving the mineral interest in the grantor. In support of its contention that the word "grounds" is one of limitation, the Authority directs us to several dictionary definitions of the term.[79] We find these sources unpersuasive.[80]

Lewis argue that the general use of the word grounds is not limited to the appurtenances and the surface surrounding the house. They assert that the contract phrase—"will convey *all* of its interest in his

house and grounds"—means that the Authority *was to retain no interest in the property.* They rely on an early Pennsylvania case in which the court held the word ground was synonymous with lands.[81]

■ *Grounds* is not a common-law term of art in the law of real property. Unlike the noun "surface",[82] the word "ground" has no defined meaning in the body of Oklahoma's common law. Within the context of the MHO Agreement, we treat the latter term as synonymous with land. In its general sense, *land* includes not only the face of the earth, but everything of a permanent nature under or over it. In this sense, it embraces both the surface of the earth and minerals, oil and gas found below the earth's face.[83] Land is defined by our statute as "the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock or other substance." [84] "The owner of land in fee has the right to the surface and to

**79.** The Authority directs us to the definition of the term *grounds* in (1) WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY (1967)—"a surrounding area ... the surface of the earth ... the area around and belonging to a house or other building; (2) WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1002 (1961)—"the gardens, lawn, and planted areas immediately surrounding and belonging to a house or other building; and (3) BLACK'S LAW DICTIONARY (4th Ed.1951)—"soil; earth; the earth's surface appropriated to private use and under cultivation or susceptible of cultivation. Though this term is sometimes used as equivalent to 'land,' it is properly of a more limited signification, because it applies strictly only to the surface, and always means dry land. *See Wood v. Carter*, 70 Ill.App. 218 [ (1897) ]; *State v. Jersey City*, 25 N.J.L. 529 [ (1856) ]; *Com. v. Roxbury*, 9 Gray, Mass., 491". The Authority asserts that other reference materials demonstrate that the term "ground" does not include minerals, *citing* WEBSTER'S COLLEGIATE THESAURUS at 390, WEBSTER'S NEW DICTIONARY OF SYNONYMS at 384 and WILLIAM C. BURTON, LEGAL THESAURUS at 243 and 915.

**80.** Our research reveals that some legal reference materials include the word "ground" in the same grouping as land or real property. *See, e.g.,* (1) ROGETS INTERNATIONAL THESAURUS, 4th Ed. (1977) at 286 (Land)—"land, ground, earth, ... real estate, real property ..."; (2) J.I. RODALE, THE SYNONYM FINDER (1978) at 475—"ground, *n.* 1.... *Archaic,* ... land ..." 2. grounds ... property ..."; (3) WILLIAM C. BURTON, LEGAL THESAURUS (1980) at 741–"ground ... property (*land*) ..., grounds ... estate (*property*) ... property (*land*)...."

**81.** In *Feree v. Sixth Ward School Dist. of Allegheny*, 76 Penn. 376, 378 (1874), the court held the word "ground" in a 1867 act was synonymous with the word "lands". This construction of the noun "ground" enabled a school district to enter upon an improved town lot to erect a schoolhouse building.

**82.** *Mack Oil Company v. Laurence*, Okl., 389 P.2d 955, 960 (1964); *Riedt v. Rock Island Improvement Company*, Okl., 521 P.2d 79, 83 (1974). In *Riedt* the court noted that the term "surface", if used to denote that which is conveyed in a real estate deed, may, without further delineating words, be one of limitation. *Id.,* syllabus 3.

**83.** At common law, land is deemed to extend from the center of the earth to the sky. This concept is expressed in the maxim—*a centro usque ad coelum.* BLACK's states the maxim more fully—*cujus est solum ejus est usque ad coelum et ad inferos*—which means that "the owner of the soil owns to the heavens and also to the lowest depths." BLACK'S LAW DICTIONARY, 5th Ed. at 22 and 341 (1979). *See Brandes v. Mitterling*, 67 Ariz. 349, 352, 196 P.2d 464, 467 (1948), where the court notes that the maxim has been applied "through the ages in a variety of circumstances," and observes that it *has been rejected in cases that measure a landowner's right in the airspace above. Id.* at 352, 196 P.2d at 467, *citing United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946).

**84.** 60 O.S.1991 § 6.

everything permanently situated beneath or above it." [85] The term land has a definite meaning that is synonymous with the word "real property." [86] Real property is defined by statute as "Land ... [t]hat which is affixed to land ... [t]hat which is incidental or appurtenant to land.... [and] [t]hat which is immovable by law." [87]

Having determined that the noun "grounds" is not to be taken as a word of limitation, we next consider whether *from a four-corners' examination* of the MHO Agreement, the parties may have intended that, at the termination of the contract, only the surface estate be conveyed to Lewis while a mineral interest stand reserved in the grantor. To create a reservation it must appear from the instrument that the grantor intended by apt words to retain some interest from the estate conveyed. A grantor in a deed is presumed to have made all the reservations intended to be made. One cannot derogate from one's grant by showing *that some reservation was intended but went unexpressed. There is a statutory presumption that every estate in land which is conveyed by deed shall be deemed an estate in fee simple unless limited by express words.*[88] These guiding principles are clearly applicable in assessing the measure of rights created by the MHO Agreement under review. *We hence conclude from a four-corners' examination of the Lewis/Authority contract that no interest was intended to be reserved in the Authority.*

### SUMMARY

We hold that, absent *any* explicit congressional directive in the 1937 Act to withdraw

**85.** 60 O.S.1991 § 64.

**86.** The terms of 25 O.S.1991 § 26(2) provide:

"1. The word 'property' includes property, real and personal.
2. The words 'real property' are coextensive with lands, tenements and hereditaments.
* * *"

**87.** The terms of 60 O.S.1991 § 5 define real property as "1. Land. 2. That which is affixed to land. 3. That which is incidental or appurtenant to land. 4. That which is immovable by law."

**88.** The terms of 16 O.S.1991 § 29 are:

from state-court cognizance contractual disputes to arise *between state-created IHAs and their Indian homebuyers,* a state district court has jurisdiction to hear these parties' contract-based claims. State courts have constitutionally-invested cognizance, concurrent with federal courts, to entertain *any* federal-law claim not explicitly withdrawn from their authority by some congressional enactment, so long as state judicature does not infringe upon tribal self-government.

An intent to reserve a mineral interest in the grantor *may not be implied* in a contract which promises to convey to the grantee *all of the grantor's interest in the "house and grounds".* The MHO Agreement in contest, written in plain, clear and unambiguous language, unmistakably reveals the parties' intent to convey fee simple title to the Indian purchasers upon their full performance of that agreement.

### THE TRIAL COURT'S JUDGMENT IS AFFIRMED.

HODGES, C.J., and SIMMS, HARGRAVE, ALMA WILSON and WATT, JJ., concur.

LAVENDER, V.C.J., concurs in result.

KAUGER and SUMMERS, JJ., dissent.

SUMMERS, Justice, dissenting;

The majority frames the jurisdiction issue as whether Oklahoma has been "ousted" from its "concurrent jurisdiction." It disregards United States Supreme Court case law as well as recent Oklahoma case law [1] squarely in point, and instead relies predomi-

"Every estate in land which shall be granted, conveyed or demised by deed or will shall be deemed an *estate in fee simple* and of inheritance, *unless limited by express words."* (Emphasis added.)
*Bryan v. Everett,* Okl., 365 P.2d 146, 147–148 (1961).

**1.** *Housing Authority of Seminole Nation v. Harjo,* 790 P.2d 1098 (Okla.1990), is effectively overruled by today's majority opinion. Other cases which are overruled, although not expressly, are *Ahboah v. Housing Authority of Kiowa Tribe,* 660 P.2d 625 (Okla.1983), *Barnett v. Newcomer,* 307 P.2d 148 (Okla.1957), and *Swain v. Hildebrand,* 36 P.2d 924 (Okla.1934).

nately on two United States Supreme Court cases dealing with "ouster." In so doing, the majority makes the assumption that the state has concurrent jurisdiction with the federal and tribal courts, and pays no heed to the abundance of United States Supreme Court law dealing with the extremely narrow jurisdiction held by a state over Indian affairs in Indian country.[2]

The majority's explanation of *Gulf Offshore v. Mobil Oil Corp.,* 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981) and *Yellow Freight System, Inc., v. Donnelly,* 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990) may be correct when applied in the proper context; however, these two cases have no relevance in this setting, and are not applicable when the state's jurisdiction is questioned because of an assertion that the event took place in Indian country. The United States Supreme Court has held, in similar instances, that application of principles derived in other areas of law are generally not helpful when attempting to resolve an issue which arose in Indian country. *See White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). Because of the special relationship between a tribe and the federal and state governments, such questions must be resolved in light of historical concepts regarding Indians. *Id.; see also* Cohen, *Handbook of Federal Indian Law* 259–280 (1984).

No party to this lawsuit raised or addressed the issue of "ouster" or "concurrent jurisdiction." Rather, they correctly framed the issue as one which focuses on whether the state courts have jurisdiction over a contract dispute involving an Indian housing authority.[3] The housing authority urges that the state lacks jurisdiction because the land dispute arose in a dependent Indian community which is included within the statutory definition of "Indian country." The Lewises disagree, urging that state courts have jurisdiction because the housing authority was created and incorporated under state law.

"With the adoption of the Federal Constitution, *Indian relations became the exclusive province of federal law." Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State,* 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1984) *reh. denied,* 471 U.S. 1062, 105 S.Ct. 2173, 85 L.Ed.2d 491 (1984) (Emphasis added); U.S. Constitution Article I, Section 8, Clause 3; U.S. Constitution, Article VI, Clause 2. The basic issue is simply whether the transaction occurred in Indian country. If it did not, the state may clearly assume jurisdiction and resolve the matter. However, if it did occur in Indian country, further analysis of Supreme Court law is necessary to determine where jurisdiction rests. "Numerous cases confirm the principle that the Indian country classification is the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands." *Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 973 (10th Cir.1987). *cert. denied* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988).[4] Thus, the question of whether this event took place in Indian country is the cornerstone and beginning point of analysis. *Oklahoma Tax Comm'n v. Sac and Fox Nation,* —— U.S. ——, ——, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993).

This framing of the issue does not preclude all state jurisdiction over Indian concerns. It requires that the analysis begin by recognizing that Oklahoma, in its Enabling Act, declined general civil regulatory jurisdiction. Oklahoma Enabling Act, Ch. 3335, § 3, 34

---

**2.** A conflict between this Court's resolution and those resolutions of the federal appeals court is reason for the United States Supreme Court to grant certiorari. *DeCoteau v. District County Court,* 420 U.S. 425, 430, 95 S.Ct. 1082, 1086, 43 L.Ed.2d 300 (1974).

**3.** At least one federal court has held that Oklahoma does not have jurisdiction over general contract disputes which arise in Indian country. *See Richardson v. Malone,* 762 F.Supp. 1463 (N.D.Okla.1991).

**4.** Cited as authority for this statement are *Solem v. Bartlett,* 465 U.S. 463, 465, 104 S.Ct. 1161, 1163, 79 L.Ed.2d 443 (1984); *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971); *Cheyenne–Arapaho Tribes of Oklahoma v. Oklahoma,* 618 F.2d 665 (10th Cir. 1980); Cohen's *Handbook of Federal Indian Law* 27–46 (R. Strickland ed. 1982); F. Cohen, *Handbook of Federal Indian Law,* 5–8 (1942).

Stat. 267, 270 (1906); *see also* Senate Report 699, 1953 U.S.Code Cong. & Admin.News 2409, 2412. Thus, any civil jurisdiction held by this state is a direct result of federal congressional action or federal case law. We, as a court, may not like the idea that we are without jurisdiction to adjudicate certain civil actions dealing with Indian matters. Nevertheless, our guidance comes from the Federal Constitution and its interpretation in judicial opinions. We are bound by the interpretation given in this area by the United States Supreme Court. *See Seneca–Cayuga Tribe v. State ex rel. Thompson,* 874 F.2d 709 (10th Cir.1989).

In *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1958), the United States Supreme Court explained the state's role with regard to jurisdiction over Indian concerns. There, a non-Indian owned and operated a store on the Navajo Reservation. He brought suit against two on-reservation Indians who had purchased goods from his store on credit and had failed to make payment. The Arizona state court refused to dismiss the action.for lack of jurisdiction, and entered judgment on behalf of the store owner. The United States Supreme Court reversed and held that the state had no jurisdiction over the matter. Quoting Chief Justice John Marshall in *Worcester v. Georgia,* 6 Pet. 515, 561, 8 L.Ed. 483 (1832), the Court explained that the laws of the state have no application because the state does not have jurisdiction:

> The Cherokee nation ... is a distinct community, occupying its own territory ... in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. *The whole intercourse between*

*the United States and this nation, is, by our constitution and laws, vested in the government of the United States.*

*Id.* 358 U.S. at 219, 79 S.Ct. at 270 (Emphasis added). The Court held that while there had been slight modifications in the law of *Worcester,* "the basic policy of *Worcester* had remained." *Id.*[5] *Williams* makes it clear that, unlike the majority's assertion, *Oklahoma does not have concurrent jurisdiction with the federal government if the event took place within Indian country.* See also *Ex parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). Instead, *there is a presumption against state jurisdiction in Indian country. Indian Country, U.S.A.,* 829 F.2d at 976, citing *Cabazon, supra,* and *Cheyenne–Arapaho Tribes, supra.*

The United States Supreme Court has repeatedly denied jurisdiction to state courts. In *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971). There, Indians bought food on credit from a grocery store on the reservation. The store brought suit against the indians in a Montana state court. The United States Supreme Court held that Montana was without jurisdiction over the matter because it had not complied with the terms of Pub.L. 83–280. Again, in *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) *reh. denied* 425 U.S. 926, 96 S.Ct. 1524, 47 L.Ed.2d 772 (1976), Montana's jurisdiction was questioned. There, an adoption proceeding had been brought in state court. The Supreme Court held that the tribe had jurisdiction over the adoption and that the state was without jurisdiction.

Later, in *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), the Court stated that the rule is not so inflexible as to preclude all

---

5. *Williams* and *Worcester* have been consistently followed in jurisprudence concerned with state jurisdiction over Indian affairs. *See, e.g. Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) reh. denied 425 U.S. 926, 96 S.Ct. 1524, 47 L.Ed.2d 772 (1976); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Rice v. Olson,* 324 U.S. 786, 65 S.Ct. 989, 89 L.Ed. 1367 (1945). The concepts have now been further refined to

permit a "a more individualized treatment of particular treaties and specific federal statutes." *Mescalero Apache Tribe,* 411 U.S. at 148, 93 S.Ct. at 1270; *see also Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); *New York ex rel. Ray v. Martin,* 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946). Because I do not believe that this property was located within Indian country, I do not fully discuss the different arenas in which the state may have jurisdiction over Indian country.

jurisdiction absent Congress' consent. Instead, the *Williams* rule was refined: "[U]nder certain circumstances a State may validly assert authority over the activities of non-members on a reservation, and ... in exceptional circumstances a State may asset jurisdiction over the on-reservation activities of tribal members." [6]

Congress has consistently acted to show that the states have only limited power to regulate Indian affairs. *Id.* 358 U.S. at 220, 79 S.Ct. at 270. The Federal Constitution, in Article I, Section 8, Clause 3, specifically states that "Congress shall have Power ... To regulate Commerce ... with Indian Tribes." Furthermore, the United States Supreme Court, as well as federal courts of appeal, have consistently held that this provision of the "Constitution vests the Federal Government with exclusive authority over relations with Indian tribes." *Montana v. Blackfeet Tribe,* 471 U.S. 759, 764, 105 S.Ct. 2399, 2402, 85 L.Ed.2d 753 (1985); *see also Bryan v. Itasca County,* 426 U.S. 373, 376, 96 S.Ct. 2102, 2105, 48 L.Ed.2d 710, 714 n. 2 (1976); *United States v. Mazurie,* 419 U.S. 544, 555, 95 S.Ct. 710, 716, 42 L.Ed.2d 706 (1975); *Indian Country, U.S.A. v. State ex rel. Oklahoma Tax Comm'n,* 829 F.2d 967, 974 (10th Cir.1987). The state's lack of jurisdiction has also been affirmed when dealing with the related concept of sovereignty. "[T]ribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), quoting *United States v. Mazurie,* 419 U.S. at 557, 95 S.Ct. at 717; *see also Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Indian Country, U.S.A., supra.*[7]

Congress provided a method by which Oklahoma could have assumed jurisdiction over some civil matters arising in Indian country. *United States v. Burnett,* 777 F.2d

593 (10th Cir.1985) *cert. denied* 476 U.S. 1106, 106 S.Ct. 1952, 90 L.Ed.2d 361 (1985). Under Public Law 83–280, as later amended in 25 U.S.C. § 1321 et seq., Congress agreed to cede jurisdiction over civil Indian matters to the states:

§ 1322. Assumption by State of civil jurisdiction

(a) Consent of United States; force and effect of civil laws

The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

Under this statute as originally enacted, the state was required to take some affirmative action to extend its jurisdiction to Indian country. Oklahoma did not take any such action. *Id. see also Oklahoma Tax Comm'n v. Sac and Fox Nation,* — U.S. at —, 113 S.Ct. at 1992. The intent as expressed by congressional reports shows that Congress investigated the various needs of states and tribes. Tribes were for the most part "agreeable to the transfer of jurisdiction" proposed under Pub.L. 83–280. *Senate Report,* at 2412. However, several states—INCLUDING OKLAHOMA—had in their constitutions expressly disclaimed jurisdiction over Indian land within state borders. The

---

6. See also *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) reh. denied 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d

1172 (1980); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

7. *See generally* Clinton, *American Indian Law* (3d ed. 1991), pp. 181–183.

Senate Report states that the effect of such disclaimers was *"to retain exclusive Federal jurisdiction ..."* (Emphasis added). If the view enunciated in the majority opinion were correct, there would have been no need for federal legislation like Pub.L. 83–280.

Thus, the question is not one of "ouster of concurrent jurisdiction" but is one of state power and authority to adjudicate an matter occurring in Indian country. While Oklahoma is not completely precluded from regulating affairs on Indian country, it does not have general civil regulatory power or authority to apply all of its general laws. *See Cabazon, infra.* "If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law." *Iowa Mutual Ins. Co. v. La-Plante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) citing *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) and *Williams v. Lee, supra.*[8]

This Court has once before attempted to exercise jurisdiction where it had not been expressly permitted by the federal government. In *State ex rel. May v. Seneca–Cayuga Tribe,* 711 P.2d 77 (Okla.1985), we stated that Oklahoma has "residual" civil jurisdiction over Indian country. Relying on a novel interpretation of Pub.L. 83–280, we held that assertion of jurisdiction under Pub.L. 83–280 was not the only way in which a state could exercise general civil jurisdiction. We stated that our state could exercise authority over Indian country under its "residual jurisdiction" powers:

The concept of 'residuary' jurisdiction is used to invest state courts with jurisdiction interstitially when the subject-matter of cognizance does not infringe upon tribal self-government and has not been preempted by congressional legislation.

*Id.* at 88. We continued by balancing the interests of the state in regulating tribal bingo against that of the federal and tribal governments, holding that the state is not necessarily precluded from exercising jurisdiction.

Unfortunately, the Tenth Circuit disagreed with our *May* analysis in *Seneca–Cayuga Tribe v. State ex rel. Thompson,* 874 F.2d 709 (10th Cir.1989). The same issue was presented in a connected case in the federal courts. The Tenth Circuit held that the Oklahoma Supreme Court's ruling in *May* was inconsistent with federal law, and because it was a matter of interpretation of federal principles, this Court's analysis was not binding. *Id.* at 714. The federal court first looked to whether it should abstain from exercising jurisdiction. Answering that question in the negative, the court pointed out the primacy of the federal interest:

The Constitution grants to Congress the power 'To regulate Commerce ... with the Indian Tribes.' U.S. Const. art I, § 8, cl. 3. The treaties and other agreements that govern the relationship between the Indians and other Americans are part of 'the supreme Law of the Land." Id. art VI, cl.2. *It is Congress that has set the terms under which modern American Indians live, the United States Supreme Court that has shaped the interpretation of those terms and the federal Bureau of Indian Affairs that has managed the day-to-day-interactions with the Tribes. Indeed, Oklahoma, like many other states, was required to disclaim jurisdiction over Indians at statehood.*

Id. at 712. (Emphasis Added). The Tenth Circuit continued by noting that the "presumption and the reality, however, are that federal law, federal policy, and federal authority are paramount in the conduct of Indian affairs in Indian Country." *Id.* at 713. The Tenth Circuit concluded that the federal

---

8. One example of insufficient state interests to justify the extent of state jurisdiction was addressed in *Cabazon.* There california sought to regulate tribal bingo, asserting that the State had an interest in preventing the infiltration of the tribal bingo enterprises by organized crime. The Supreme Court held this to be insufficient to permit the state to have jurisdiction. This deci- sion is important especially in light of the fact that California had expressly been granted certain jurisdictional rights under Pub.L. 280, yet the Court still declined to extend the state's jurisdiction to cover this situation. Oklahoma, by failing to take action under Pub.L. 280, has even less regulatory authority than does California.

court—not the Oklahoma state courts—had jurisdiction to regulate the civil matter of tribal bingo.

As for the majority's claim that *Harjo* and *Ahboah* failed to consider "ouster" principles, these two cases have been approved by a federal court. In *Richardson v. Malone*, 762 F.Supp. 1463 (N.D.Okla.1991), the federal district court held that it had jurisdiction over a foreclosure action against Indian defendants involving property located in Indian country. The court again pointed out that Oklahoma had not accepted civil jurisdiction as authorized by Pub.L. 83–280. Citing *Harjo* and *Ahboah,* the federal court agreed that the state did not have jurisdiction. *Id.* at 1466. Because of the absence of tribal courts and the lack of jurisdiction in the state court, the contract dispute was properly lodged in the federal courts.

Here, if the transaction or land involved was not Indian country[9] within the definition of 18 U.S.C. § 1151, then Oklahoma courts have jurisdiction to decide the matter. It is with this inquiry that *Ahboah v. Housing Authority of the Kiowa Tribe of Indians,* 660 P.2d 625 (Okla.1983) and *Housing Authority of Seminole Nation v. Harjo,* 790 P.2d 1098 (Okla.1990) come into play. These two cases dealt with Section 1151's definition of "Indian country." The relevant portion of Section 1151 states that "Indian country" includes "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state."

In *Harjo*, an Indian homeowner fell behind in her payments to the Indian housing authority. The authority brought suit in state court for forcible entry and detainer. The homeowner urged that the state did not have jurisdiction over the matter because her

home was located in a dependant Indian community. The evidence showed that she inherited restricted Seminole land from her husband. She deeded the land to the housing authority to build her a house. Under a Mutual Help and Occupancy Agreement, the authority built the house. The woman agreed to make payments for seventeen years. After all payments were made, the house and land were to be deeded back to her.

Relying on federal case law[10], we held that the factors to be considered when determining whether land is located in a dependant Indian community were:

> (1) [W]hether the United States had retained title to the lands which it permits the Indians to occupy and authority to enact regulations and protective laws respecting this territory, (2) the nature of the area in questions, the relationship of the inhabitants of the area to Indian tribes and to the federal government and the established practice of government agencies toward the area, (3) whether there is an element of cohesiveness manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality, and (4) whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples.

The federal government has jurisdiction over "those communities which, while neither part of a federal reservation nor Indian 'allotments,' are both 'Indian' in character and federally dependent." *Harjo,* 790 P.2d at 1100–1101, *quoting United States v. Levesque,* 681 F.2d 75, 77 (1st Cir.1982), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982). In general terms, the decisive question is whether the land was "validly set apart for the use of the Indians,

---

**9.** It is not "reservation" status that blocks the state from asserting jurisdiction. In *Oklahoma Tax Comm'n v. Sac and Fox Nation,* —— U.S. ——, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993), the United States Supreme Court stated that "reservation" status was irrelevant; the proper inquiry was whether the event took place in "Indian country" or involved a tribal member who lived in "Indian country." *Id.* at ——, 113 S.Ct. at 1991. The Court went on to note that "Congress has defined Indian country broadly to include

formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." *Id.; see* 18 U.S.C. § 1151.

**10.** *United States v. South Dakota,* 665 F.2d 837 (8th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982); *United States v. Martine,* 442 F.2d 1022 (10th Cir.1971).

as such, under the superintendence of the government." *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914). The ultimate decision as to whether land is situated within a dependent Indian community is factually specific. *Pelican, supra; Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1391 (9th Cir.1988).

We held that under the circumstances presented in *Harjo*, the land was located within a dependant Indian community. The land remained subject to the control of the federal government; there were comprehensive governmental regulations regarding the MHO agreement. The tribe maintained the sewage and health services to the area. The schools received federal funding, through programs designed to help Indian children. An anthropologist testified that the living arrangement was consistent with a distinct traditional pattern of dwelling within Indian families. The house was located near Indian churches where traditional Indian languages were spoken.

The evidence is not nearly so strong in the present case. The land in question was not owned by Indians nor held in trust for their benefit prior to the purchase by the housing authority. The home is located on unrestricted fee land. There is not intensive control by the federal government through HUD, because the MHO agreement has been completed and the house and land has been deeded to the Lewises. There do not seem to be close tribal ties to the housing addition. There is no evidence that the residents of the house are dependent on the Sac and Fox Tribe for police or fire protection.[11] Importantly, the Lewis's assert that they are not part of an Indian community. Unlike *Harjo*, where four tracts of lands were deeded to build houses for members of the same family, the only connection between the Lewises and the other homeowners is location. The land was not 'set apart for the use of Indians, as such under the superintendence of the government." *Pelican*, 232 U.S. at 449, 34 S.Ct. at 399.

I would determine that the facts are not sufficient to show a "dependent Indian community" under *Harjo*. Thus, the land is not Indian country as defined by Section 1151. The state court has jurisdiction to decide the controversy. This rationale is consistent with the decisions of the United States Supreme Court, the federal courts of appeal, and our own jurisprudence.

I am authorized to state that KAUGER, J., joins in these views.

---

**11.** The Authority states that such protection is available.