OSCN Found Document:IN RE: STATE QUESTION No. 807, INITIATIVE PETITION No. 423

 

 
 

 
 IN RE: STATE QUESTION No. 807, INITIATIVE PETITION No. 423
2020 OK 57
Case Number: 118582
Decided: 06/23/2020
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2020 OK 57, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

IN RE: STATE QUESTION No. 807, INITIATIVE PETITION No. 423
PAUL TAY, Petitioner,
v.
RYAN KIESEL and MICHELLE TILLEY, Respondents.
ORIGINAL PROCEEDING TO DETERMINE THE CONSTITUTIONAL VALIDITY OF STATE QUESTION NO. 807, INITIATIVE PETITION NO. 423
Â¶0 This is an original proceeding to determine the legal sufficiency of State Question No. 807, Initiative Petition No. 423. The petition seeks to create a new article to the Oklahoma Constitution, Article 31, for the purpose of legalizing, regulating, and taxing the use of marijuana by Oklahoma adults. Petitioner Paul Tay filed this protest alleging the petition is unconstitutional because it violates the federal supremacy provisions of Article VI, clause 2 of the United States Constitution and Article 1, Section 1 of the Oklahoma Constitution. Petitioner alleges the proposed measure is preempted by existing federal statutes including the Controlled Substances Act, 21 U.S.C. Â§Â§ 801-904, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Â§Â§ 1961-1968, and Section 280E of the Internal Revenue Code, 26 U.S.C. Â§ 280E. Because the United States Supreme Court has not addressed this question, the Supremacy Clause permits us to perform our own analysis of federal law. Upon our review, we hold Petitioner has not met his burden to show clear or manifest facial constitutional infirmities because he has not shown State Question No. 807 is preempted by federal law. On the grounds alleged, the petition is legally sufficient for submission to the people of Oklahoma.
STATE QUESTION NO. 807, INITIATIVE PETITION NO. 423 IS 
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF 
OKLAHOMA
Paul Tay, Tulsa, Oklahoma, pro se Petitioner.
D. Kent Meyers and Melanie Wilson Rughani, Crowe & Dunlevy, Oklahoma City, Oklahoma, for Respondents.
PER CURIAM:
I.
FACTS AND PROCEDURAL HISTORY
Â¶1 On December 27, 2019, Respondents Ryan Kiesel and Michelle Tilley (Respondents) filed State Question No. 807, Initiative Petition No. 423 (SQ 807) with the Secretary of State of Oklahoma. SQ 807 proposes for submission to the voters the creation of a new constitutional article, Article 31, which would legalize, regulate, and tax the use of marijuana by adults under Oklahoma law. Notice of the filing was published on January 3, 4, & 8, 2020. Within ten business days, Petitioner Paul Tay (Petitioner) brought this original proceeding pursuant to the provisions of 34 O.S. Supp. 2015 Â§ 8(b)[1], challenging the constitutionality of SQ 807. Petitioner alleges the proposed amendment by article is unconstitutional because it violates the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, as well as Okla. Const., art. 1, Â§ 1, which provides that the United States Constitution is the supreme law of the land. Specifically, Petitioner contends SQ 807 is preempted by the Controlled Substances Act (CSA), 21 U.S.C. Â§Â§ 801-904, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Â§Â§ 1961-1968, and Section 280E of the Internal Revenue Code, 26 U.S.C. Â§ 280E (2018).
II.
THE PROPOSED MEASURE
Â¶2 The proposed Article 31 contains seventeen (17) sections. Section 1 provides for definitions used throughout Article 31. Section 2 contains limitations, noting Article 31 does not affect or limit laws that govern use by minors under twenty-one (21) years of age or use in certain circumstances or locations. Section 3 provides Article 31 will not limit the rights and privileges of medical marijuana patients, or the rights of employers and governments except in the ways provided.
Â¶3 Section 4 legalizes the personal use of marijuana. Section 4 declares the possession and use of certain amounts of marijuana to be not unlawful and not an offense under state law. It also provides similar status to personal cultivation of marijuana plants. In addition, Section 4 provides certain protections for personal use in such areas as parental rights, parole, privacy, eligibility in public assistance, and possession of firearms. Section 5 creates civil fines and penalties for violations of the possession and use restrictions found in Article 31, primarily in Section 4.
Â¶4 Section 6 renames the Oklahoma Medical Marijuana Authority to the Oklahoma Marijuana Authority (Authority) and gives it power over licensing for the commercial cultivation and sale of marijuana. Section 7 requires the Authority to promulgate rules and regulations for implementation and enforcement of Article 31. Section 7 also sets out comprehensive areas that must be addressed by those regulations, including labelling, security, inspection, and testing procedures.
Â¶5 Section 8 provides protections for licensees, declaring conduct authorized by Article 31 as not unlawful under Oklahoma law. Section 8 further notes that contracts will not be unenforceable on the basis marijuana is prohibited by federal law, and professionals will not be subject to discipline in Oklahoma for providing advice to licensees based on federal law prohibitions. Section 9 provides for various restrictions on licensees, concerning areas such as location, security, and the need to comply with Authority inspection.
Â¶6 Section 10 allows local governments, subject to the provisions of Section 4 and 8, to regulate the time, place, and manner of business licensed under Article 31. However, Section 10 also prevents local governments from prohibiting licensees in their jurisdictions after the next election, from prohibiting transportation of marijuana, and from adopting unduly burdensome regulations or ordinances.
Â¶7 Section 11 imposes an excise tax of fifteen percent (15%) on the gross receipt of sales of marijuana by licensees to consumers. Section 11 also permits the Legislature to alter the excise tax rate after November 3, 2024, and requires the Oklahoma Tax Commission (OTC) to both collect the tax and establish rules and procedures for collection. Section 12 creates the Oklahoma Marijuana Revenue Trust Fund (Fund) to receive the proceeds from the excise tax. Section 12 also provides for percentage-based distribution of that revenue after costs for running the Authority are deducted. Revenue from the Fund will be distributed in the following manner: 1) four percent (4%) to the political subdivisions where the retail sales occurred; 2) forty-eight percent (48%) to grants for public schools; and 3) forty-eight percent (48%) to provide grants to agencies and non-profit organizations to increase access to drug addiction treatment services. Section 12 also contains provisions to prevent legislative undercutting of funding in those areas due to the new revenue from the Fund.
Â¶8 Section 13 provides for judicial review of rules and regulations adopted by the Authority pursuant to the Oklahoma Administrative Procedures Act (APA). Section 14 requires the Authority to publish an annual report concerning licensees, any actions taken against them, revenues and expenses of the Authority, and revenue collected by the OTC.
Â¶9 Section 15 provides for retroactive application of Article 31. Section 15 allows those convicted of once-criminal conduct made lawful by Article 31 to petition for resentencing, reversal of conviction and dismissal, or modification of their judgment and sentence. Section 15 also creates a procedure for the State to oppose such a petition, including based on an unreasonable risk of danger to an identifiable individual's safety. Section 16 is a severability clause, and Section 17 notes Article 31's effective date will be ninety (90) days after it is approved by the people of Oklahoma.
III.
STANDARD OF REVIEW
Â¶10 "The first power reserved by the people is the initiative," which includes "the right to propose amendments to the Constitution by petition...." Okla. Const. art. 5, Â§ 2; In re: Initiative Petition No. 420, State Question No. 804, 2020 OK 9, Â¶12, ___ P.2d ___; In re Initiative Petition No. 409, State Question No. 785, 2016 OK 51, Â¶2, 376 P.3d 250. This Court has repeatedly noted that the right of initiative is precious, and one which the Court must zealously preserve to the fullest measure of the spirit and letter of the law. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶12; Okla. Oil & Gas Ass'n v. Thompson, 2018 OK 26, Â¶4, 414 P.3d 345; In re Initiative Petition No. 382, State Question No. 729, 2006 OK 45, Â¶3, 142 P.3d 400.
Â¶11 However, while the right of initiative is zealously protected by the Court, it is not absolute. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶13; Okla. Oil & Gas Ass'n, 2018 OK 26 at Â¶5. Any citizen of Oklahoma may protest the sufficiency and legality of an initiative petition. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶13; In re Initiative Petition No. 409, 2016 OK 51 at Â¶2; In re Initiative Petition No. 384, State Question No. 731, 2007 OK 48, Â¶2, 164 P.3d 125. Upon such a protest, it is the duty of this Court to review the petition to ensure that it complies with the rights and restrictions established by the Oklahoma Constitution, legislative enactments, and this Court's jurisprudence. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶13; In re: Initiative Petition No. 384, 2007 OK 48 at Â¶2.
Â¶12 Pre-election review of an initiative petition under 34 O.S. Supp. 2015 Â§ 8 is confined to determining whether there are "clear or manifest facial constitutional infirmities" in the proposed measure. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶13 (quoting In re: Initiative Petition No. 358, State Question No. 658, 1994 OK 27, Â¶7, 870 P.2d 782). Further, because the right of the initiative is so precious, the Court has held that "all doubt as to the construction of pertinent provisions is resolved in favor of the initiative. The initiative power should not be crippled, avoided, or denied by technical construction by the courts." In re: Initiative Petition No. 420, 2020 OK 9 at Â¶12; In re Initiative Petition No. 403, State Question No. 779, 2016 OK 1, Â¶3, 367 P.3d 472. Thus, a protestant bears the heavy burden of demonstrating the required clear or manifest constitutional infirmity. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶14; In re Initiative Petition No. 362, State Question No. 669, 1995 OK 77, Â¶12, 899 P.2d 1145.
IV.
ANALYSIS
A. Principles of Federal Preemption and the Anticommandeering Doctrine
Â¶13 Petitioner's argument rests on the interpretation and application of the federal supremacy provisions of the United States Constitution
[2] and the Oklahoma Constitution.[3] Petitioner asserts SQ 807 is preempted because it conflicts with existing federal legislation concerning controlled substances such as marijuana. The federal government, acting through Congress, has the power to preempt state law pursuant to the Supremacy Clause. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); Craft v. Graebel-Oklahoma Movers, Inc., 2007 OK 79, Â¶11, 178 P.3d 170. State law and state constitutional provisions must also yield to the United States Constitution. See Okla. Coalition for Reproductive Justice v. Cline, 2012 OK 102, Â¶2, 292 P.3d 27; In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, Â¶12-13, 838 P.2d 1.
Â¶14 With respect to both the United States Constitution and federal statutes enacted by Congress, this Court is governed by the decisions of the United States Supreme Court and must pronounce rules of law that conform to extant Supreme Court jurisprudence. Hollaway v. UNUM Life Ins. Co. of America, 2003 OK 90, Â¶15, 89 P.3d 1022; Bogart v. CapRock Communications Corp., 2003 OK 38, Â¶13, 69 P.3d 266; Cline, 2012 OK 102 at Â¶12 ("Because the United States Supreme Court has spoken, this Court is not free to impose its own view of the law...").
Â¶15 However, subject to decisions of the United States Supreme Court, we are free to promulgate judicial decisions grounded in our own interpretation of federal law. Hollaway, 2003 OK 90 at Â¶15; Bogart, 2003 OK 38 at Â¶13. The Supreme Court of the United States has yet to directly address federal law preemption of state marijuana regulation. Because the United States Supreme Court has not considered this question we are free to make our own determination on preemption and indeed have a duty to do so since the question has been placed before us. That is a freedom we do not have where the United States Supreme Court has pronounced clear rules on federal questions, such as an individual's right to abortion protected by the United States Constitution. See, e.g., In re Initiative Petition No. 395, State Question No. 761, 2012 OK 42, 286 P.3d 637; In re Initiative Petition No. 349, State Question No. 642, 1992 OK 122, 838 P.2d 1. An individual's constitutional right to an abortion is hardly the only area in which this Court has determined it is bound by United States Supreme Court precedent on federal questions. For example, in Lewis v. Sac and Fox Tribe of Okla. Housing Auth., 1994 OK 20, Â¶5, 896 P.2d 503, the Court noted its jurisdiction to adjudicate certain civil actions concerning Indian matters was limited by opinions of the United States Supreme Court addressed to the question. In Cities Service Gas Co. v. Okla. Tax Com'n, 1989 OK 69, Â¶7, 774 P.2d 468, the Court noted it was obligated to apply the United States Supreme Court's four pronged test to decide whether state taxes on interstate commerce were permissible under the commerce clause. In Bailess v. Paukune, 1953 OK 349, 254 P.2d 349, the Court overruled a prior decision concerning interpretation of the General Allotment Act of February 8, 1887, on remand from an appeal to the United States Supreme Court, because that Court's interpretation was binding.
Â¶16 Petitioner asserts SQ 807 is constitutionally infirm because it conflicts with federal legislation. When it comes to the preemptive effect of federal legislation, the purpose of Congress is the ultimate touchstone. Altria Group, Inc. v. Good, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.ed.2d 398 (2008). Consideration of any issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not preempted by federal action unless that is the clear and manifest purpose of Congress. Altria Group, Inc., 555 U.S. at 78; Cipollone, 505 U.S. at 516; Rice v. Santa Fe Elevator Corp., 331 U.S 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The preemption doctrine is thus not an independent grant of legislative power to the Congress but rather a rule of decision applied in the case of an apparent conflict between federal and state law. Murphy v. Natl. Collegiate Athletic Ass'n, ___ U.S. ___, 138 S.Ct. 1461, 1479 (2018). See Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 324-25, 135 S.Ct. 1378, 191 L.Ed.2s 471 (2015).
Â¶17 There are three varieties of preemption that may arise from federal action: express preemption, field preemption, and conflict preemption. Murphy, 138 S.Ct. at 1480. See English v. General Elec. Co., 496 U.S. 72, 78-79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Express preemption occurs when a federal statute includes a provision stating that it displaces state law and defining the extent to which state law is preempted. See Dan's City Used Cars, Inc. v. Pelkey, 569 U.S. 251, 256, 133 S.Ct. 1769, 185 L.Ed.2d 909. Field preemption occurs when Congress expresses an intent to occupy an entire field, such that even complementary state regulation in the same area is foreclosed. Arizona v. U.S., 567 U.S. 387, 401, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Finally, conflict preemption occurs when there is an actual conflict between state and federal law. See Geier v. American Honda Motor Co., Inc., 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914. Despite nuances in how they arise, these forms of preemption all function in essentially the same way:
Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted.
Murphy, 138 S.Ct. at 1480.
Â¶18 While the Supremacy Clause and the preemption doctrine may effectively prevent States from regulating areas controlled by federal law, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." Murphy at 1477. Known as the anticommandeering doctrine, this principle means that even a particularly strong federal interest does not enable Congress to command a state government to enact state regulation or enable it to compel a state to enact and enforce a federal regulatory scheme. See id. at 1466-77; New York v. United States, 505 U.S. 144, 161 & 178, 112 S.Ct. 2408, 120 L.ed.2d 120 (1992).
B. SQ 807 is not preempted by the Controlled Substances Act, 21 U.S.C. Â§Â§ 801 -- 904.
Â¶19 Petitioner argues several federal provisions effectively preempt SQ 807. First, Petitioner argues SQ 807 is unconstitutional because it is preempted by the provisions of the Controlled Substances Act (CSA), 21 U.S.C. Â§Â§ 801 -- 904. The CSA governs the use and trafficking of controlled substances, including marijuana. Marijuana is a Schedule I controlled substance pursuant to the CSA, and thus it is illegal under federal law for any person to manufacture, distribute, or dispense, marijuana, and also illegal under federal law for any person to possess marijuana with intent to manufacture, distribute, or dispense it. See 21 U.S.C. Â§Â§ 841(a)(1) & 844(a) (2018). Petitioner asserts this prohibition renders SQ 807 facially unconstitutional.
Â¶20 The CSA contains an explicit preemption provision. Title 21 U.S.C. Â§ 903 (2018) provides:
No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together. 
Section 903 states that the CSA's provisions do not expressly preempt state law and are not intended to exclusively occupy any field to the exclusion of state law. Thus, of the three types of preemption only conflict preemption is relevant.
Â¶21 Federal courts have interpreted the "positive conflict" language used in Section 903 to mean that state laws are preempted only in cases of actual conflict with federal law such that compliance with both federal and state law is a physical impossibility, see Hillsborough County, Fla. v. Auto. Medical Laboratories, Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714, or where state law stands as an obstacle to the accomplishment and execution of Congress' full purposes and objectives. Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). 
Â¶22 Petitioner first argues SQ 807 explicitly states an intention to usurp the supremacy of the CSA. This is incorrect. SQ 807 does not mention the CSA, nor does it state any intent to comprehensively regulate all controlled substances to the exclusion of the CSA. However, Petitioner correctly notes that SQ 807 effectively provides limited immunity from prosecution under state law for possession and distribution of marijuana. The decision to exercise that immunity, by either possessing and using marijuana as a consumer or taking advantage of the licensing scheme for production and distribution, could subject individuals to federal prosecution under the CSA. Petitioner argues this makes compliance with both federal and state law impossible.
Â¶23 The physical impossibility standard is a high burden. Federal precedent suggests that anything short of explicitly conflicting commands to act one way and also act the opposite way is insufficient to satisfy that burden. See Wyeth v. Levine, 555 U.S. 555, 571-73, 581, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009); Barnett Bank, N.A. v. Nelson, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). Respondents assert that SQ 807 does not create a situation where compliance with both federal and state law is impossible. SQ 807 contains no affirmative mandate that individuals use marijuana or that they grow it for commercial distribution. Oklahomans, Respondents argue, "can elect to refrain from using cannabis and, thus, be fully compliant with both federal and state law."
[4] 
Â 
Â¶24 In Wyeth, the Supreme Court determined physical impossibility was a "demanding defense" that did not apply where a state law required a drug manufacturer to change its warning labels after they had been approved by the FDA because there was no evidence to suggest the FDA would object to the amended warning label. 555 U.S. 555 at 571-73. In a more factually relevant scenario, in Barnett Bank, N.A., the Court did not find physical impossibility in a scenario where a federal statute authorized the sale of insurance and a state statute forbade the same sale of insurance. 517 U.S. 25 at 31. The Court noted the "two statutes do not impose directly conflicting duties on national banks-as they would, for example, if the federal law said, 'you must sell insurance,' while the state law said, 'you may not.'" Id. In the present matter, the proposed Article 31 contains no mandate that requires Oklahomans to violate any provision of the CSA. Thus, it is not facially physically impossible to comply with both state law and the CSA, were SQ 807 to be adopted.
Â¶25 Petitioner additionally contends SQ 807 stands as an obstacle to the accomplishment and execution of Congresses' purposes in enacting the CSA. That is also a high threshold to meet. See Chamber of Commerce of U.S. v. Whiting, 563 U.S. 582, 607, 131 S.Ct. 1968, 563 U.S. 582 (2011). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Id. at 373.
Â¶26 The manifest purpose of the CSA was "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." Gonzales v. Raich, 545 U.S. 1, 12, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). SQ 807 does not purport to limit or prevent federal authorities from enforcing federal law. SQ 807 instead would alter how Oklahoma regulates marijuana and would provide a form of limited immunity under state law for users and producers that satisfy the measure's requirements. Further, the federal government lacks the power to compel Oklahoma, or any other state, to enforce the provisions of the CSA or to criminalize possession and use of marijuana under state law. See Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S.Ct. 1461, 1475-79, 200 L.Ed.2d 854 (2018) (discussing and applying the anticommandeering doctrine).
Â¶27 Petitioner argues one of the purposes of the CSA was to bring the United States into compliance with various treaty obligations, including the Vienna Convention on Psychotropic Substances. See 21 U.S.C. Â§ 801a (2018). In support of his argument, Petitioner cites old decisions of the United States Supreme Court that struck down state laws inconsistent with U.S. treaty obligations and established the supremacy of the federal government. See Ware v. Hylton, 3 U.S. 199, 1 L.Ed. 568 (1796) (holding treaty provisions are binding as U.S. domestic law and take precedence over state law); M'Culloch v. Maryland, 17 U.S. 316, 4 L.Ed. 579 (1819) (holding state action may not impede valid constitutional exercises by the federal government). However, beyond conclusory statements Petitioner makes no argument as to how exactly SQ 807 prevents the U.S. from complying with its treaty obligations as reinforced in the CSA.
Â¶28 "'The case for federal preemption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.'" Wyeth, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 166-67, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Respondents argue the CSA was never intended to coerce the states to follow or adopt its specific regulatory scheme, and the states are free to engage in their own complementary regulation of controlled substances, even if that regulation differs in scope and standards.
Â¶29 Respondents' argument is supported by the anticommandeering doctrine and the recent decision of the Supreme Court of the United States in Murphy. In that case, the Court invalidated a federal law that prohibited states from authorizing sports gambling schemes. Specifically, the challenged provision of the Professional Amateur Sports Protection Act (PASPA) made it unlawful for a state to sponsor, operate, advertise, promote, license, or authorize by law or compact gambling and betting on competitive sporting events. Murphy, 138 S.Ct. at 1470. The Court concluded that a state repealing an existing ban on sports gambling constituted "authorization" of that activity, but that the PASPA provision at issue was an unconstitutional violation of the anticommandeering doctrine because it unequivocally dictated what a state legislature could and could not do. Id. at Â¶1478. However, the Murphy Court noted that the anticommandeering doctrine and preemption require separate analysis. Notably, because the challenged PASPA provision did not impose any restrictions on private actors, the Court determined federal preemption was not implicated. Id. at 1481.
Â¶30 The posture of this case is distinct from Murphy. Clearly Congress lacks the power to enact a law ordering a state legislature to refrain from enacting a law licensing the growing and use of marijuana for individual consumption. See id. at 1482. That is not what the CSA does. Rather, unlike the challenged provisions of PASPA, the CSA's restrictions are directed at private individuals. Still, Murphy is useful by analogy to reinforce the limits of the CSA's intended scope and the limits of its preemption. In enacting the CSA, Congress specifically chose to leave room for state regulation of controlled substances, likely in part because its ability to compel the states is limited (per Murphy) but also because it relied on the states to voluntarily shoulder the burden of policing and regulating controlled substances. See 21 U.S.C. Â§ 903 (2018). The fact that Oklahoma might choose to do so in a far less restrictive way than the CSA does not mean doing so inherently frustrate the CSA's overarching purposes.
Â¶31 The reasoning of the Supreme Court of Arizona concerning its medical marijuana statute is instructive on that point:
The state-law immunity AMMA provides does not frustrate the CSA's goals of conquering drug abuse or controlling drug traffic. Like the people of Michigan, the people of Arizona 'chose to part ways with Congress only regarding the scope of acceptable medical use of marijuana.' Ter Beek, 846 N.W.2d at 539. 
Reed-Kaliher v. Hoggat, 237 Ariz. 119, Â¶23, 347 P.3d 136 (2015). By adopting SQ 807, the people of Oklahoma would be going farther than the people of Arizona, but they would still simply be parting ways with Congress on the scope of acceptable marijuana use and how unacceptable use is to be penalized. Use by those under 21, in public, and under other conditions, would remain prohibited. Further, SQ 807 also makes no attempt to impede federal enforcement of the CSA where marijuana is concerned.
[5] 
Â 
Â¶32 Not all states are in agreement. The Supreme Court of Oregon relied on Michigan Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd., 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) in finding Oregon's medical marijuana statute was preempted by federal law in Emerald Steel Fabricators, Inc. v. Bureau of Labor and Industries, 230 P.3d 518 (Oregon 2010).
[6] At a glance, Michigan Canners and Freezers Ass'n, might appear to be controlling. In that case the Supreme Court concluded Michigan's Agricultural Marketing and Bargaining Act was preempted by the federal Agricultural Fair Practices Act because the former stood as an obstacle to the accomplishment of the latter's purpose.
Â¶33 Michigan's law gave food producer's associations the option to obtain from the state the right to act as the exclusive bargaining agent for all producers of a particular commodity. Id. at 466. Doing so would interfere with producers' freedom to bring their products to market individually or through an association, as guaranteed by the Agricultural Fair Practices Act. See id. at 464-65. The Court concluded that "because the Michigan Act authorizes producers' associations to engage in conduct that the federal Act forbids, it 'stands as an obstacle to the--accomplishment and execution of the full purposes and objectives of Congress.'" Id. at 478 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1984)).
Â¶34 However, we find Michigan Canners was properly distinguished by the Supreme Court of Michigan in Ter Beek v. City of Wyoming, 846 N.W.2d 531 (Mich. 2014). There, the court explained:
The United States Supreme Court concluded that the Michigan Act was preempted by the AFPA because the Michigan Act, by compelling individual producers to effectively join and be bound by the actions of accredited associations, "empowers producers' associations to do precisely what the federal Act forbids them to do" and "imposes on the producer the same incidents of association membership with which Congress was concerned in enacting" the AFPA. Id. at 478, 104 S.Ct. 2518. In other words, the AFPA guaranteed individual producers the freedom to choose whether to join associations; the Michigan Act, however, denied them that right.
Such circumstances are not present here. Section 4(a) simply provides that, under state law, certain individuals may engage in certain medical marijuana use without risk of penalty. As previously discussed, while such use is prohibited under federal law, Â§ 4(a) does not deny the federal government the ability to enforce that prohibition, nor does it purport to require, authorize, or excuse its violation. Granting Ter Beek his requested relief does not limit his potential exposure to federal enforcement of the CSA against him, but only recognizes that he is immune under state law for MMMA-compliant conduct, as provided in Â§ 4(a). Unlike in Michigan Canners, the state law here does not frustrate or impede the federal mandate.
Id. at 539-40 (emphasis added).
Â¶35 Based on the above analysis and the lack of a bright line rule concerning conflict preemption in this area, we find Petitioner has not demonstrated that SQ 807 is clearly or manifestly unconstitutional due to its alleged preemption by the CSA. Like the people of Michigan and Arizona, the voters of Oklahoma, should they adopt SQ 807, would be parting ways with Congress only regarding the scope of acceptable use of marijuana. See Reed-Kaliher v. Hoggatt, 237 Ariz. 119, Â¶Â¶22-23, 347 P.3d 136 (2015); Ter Beek, 846 N.W.2d at 536-41.
[7] 
Â 
C. SQ 807 unlikely to result in State violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Â§Â§ 1961 -- 1968.
Â¶36 Petitioner also asserts SQ 807 is unconstitutional because it would create a state-sponsored agency specifically to engage in criminal money laundering by levying and collecting an excise tax on cannabis and creating a fund to funnel that money to other agencies and non-profit entities. Petitioner thus asserts SQ 807 necessitates violation of The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Â§Â§ 1961 -- 1968.
Â¶37 RICO prohibits persons from receiving income derived from a pattern of racketeering activity, which includes "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substance Act) punishable under any law of the United States." 18 U.S.C. Â§ 1961(1)(D) (2018). RICO is to be read broadly. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). RICO also created a new civil cause of action for any person injured in their business or property by reason of a violation of its prohibitions. RJR Nabisco, Inc. v. European Cmty., ___ U.S. ___, 136 S.Ct. 2090, 2096, 195 L.Ed.2d 476 (2016). See 18 U.S.C. Â§ 1964 (2018). Petitioner, however, is not alleging a private RICO claim.[8] Rather, he is asserting SQ 807, if adopted, would result in an inevitable violation of RICO's provisions. Though petitioner does not specifically invoke the preemption doctrine, his framing of this tension implies a form of conflict preemption.
Â¶38 Respondents acknowledge that, like the CSA, RICO remains a potential ongoing threat to any individuals engaged in the cannabis business. However, Respondents also correctly note that Petitioner is not asserting SQ 807 is unconstitutional because of RICO's potential application to individual private citizens. Rather, Petitioner argues SQ 807 is unconstitutional because it will force the State of Oklahoma and its officials to engage in RICO violations through the excise tax provisions.[9] Petitioner's argument is flawed for several reasons. First, government entities are not subject to the criminal law provisions of RICO because they cannot form the necessary malicious intent for the predicate acts. See Lancaster Community Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397 (9th Cir. 1991).[10] Further, state and local officials are granted immunity from the majority of the provisions of the CSA that create the predicate acts for a RICO violation.[11] 
Â 
Â¶39 Petitioner's RICO argument is focused on the excise tax provisions of SQ 807 that would result in the state handling tax revenue from the marijuana industry and appropriating it for use.
[12] In addition to the specific limitations of RICO itself when applied to a sovereign entity, Petitioner's argument is flawed because illegality of a given activity is not a bar to its lawful taxation. Petitioner attempts to paint the excise tax provisions of SQ 807 as a form of racketeering. Sections 11 and 12 of SQ 807 create an excise tax and revenue framework very similar to the state's other existing excise taxes. The United States Supreme Court has upheld the taxation of federally-unlawful activities on multiple occasions. See Department of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 778, 114 S.Ct. 1937, 128 L.Ed.2d 767; U.S. v. Sullivan, 274 U.S. 259, 263, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). Kurth Ranch concerned the punitive nature of a tax on marijuana specifically, and the Court explained:
As a general matter, the unlawfulness of an activity does not prevent its taxation. Montana no doubt could collect its tax on the possession of marijuana, for example, if it had not previously punished the taxpayer for the same offense, or, indeed, if it had assessed the tax in the same proceeding that resulted in his conviction. 
511 U.S. at 778 (internal citations omitted) (emphasis added). Multiple states have taxed marijuana in various ways despite criminal prohibitions. See State v. Gulledge, 896 P.2d 378 (Kan. 1995); State v. Garza, 496 N.W.2d 448 (Neb.1993); Sisson v. Triplett, 428 N.W.2d. 565 (Minn. 1988).
Â¶40 The U.S. Government itself already collects taxes on marijuana businesses that are illegal under federal law. See IRS, Taxpayers Trafficking in a Schedule I or II Controlled Substance, Dec. 10, 2014, https://www.irs.gov/pub/irs-wd/201504011.pdf. Title 26 U.S.C. Â§ 280E (2018), which Petitioner cites in support of his argument, actually supports the legal taxation of marijuana. Section 280E forbids marijuana businesses from deducting business expenses from their gross income when calculating their federal income taxes.
[13] Implicit in the provision is the acknowledgement that marijuana businesses are otherwise paying taxes on illegal activity. Further, it is axiomatic that if the states and federal government are permitted to tax illegal activity, they are permitted to use the resulting revenue. Based on the above analysis, Petitioner has not shown that SQ 807 is clearly and manifestly unconstitutional because it would force the state and state officials to engage in unlawful conduct that violates RICO by taxing marijuana in Oklahoma.[14] 
V.
CONCLUSION
Â¶41 In considering federal law questions, the Supremacy Clause requires this Court adhere to decisions of the United States Supreme Court. We have previously declared unconstitutional various initiative petitions and state laws that infringed upon rights the United States Supreme Court has expressly determined are guaranteed by the United States Constitution. We have also followed United States Supreme Court precedent on federal questions in diverse areas such as Indian law and application of the Commerce Clause. However, the United States Supreme Court has never addressed preemption of state marijuana laws under federal statutes such as the CSA.
Â¶42 Petitioner argues that this uncertainty concerning federal preemption of state marijuana regulations compels this Court to declare SQ 807 unconstitutional. The opposite is true. The burden is on a protestant to demonstrate that a proposed initiative is clearly and manifestly unconstitutional on its face. In re: Initiative Petition No. 420, 2020 OK 9 at Â¶14.
Â¶43 This Court acknowledges the lack of controlling federal precedent has created uncertainty concerning the interplay between state regulatory schemes permitting marijuana use and existing federal law. The people of Oklahoma have spoken once on this interplay between state regulations and existing federal law in the approval and implementation of SQ 788, Oklahoma's legalization of medical marijuana. We have confronted that uncertainty, and considered the question in depth by examining the parameters of SQ 807, the language of federal statutes such as the CSA, and principles of preemption under the Supremacy Clause. Based on the above analysis, Petitioner has failed to meet his burden of demonstrating that SQ 807 is clearly or manifestly unconstitutional. We hold therefore that State Question No. 807, Initiative Petition No. 423, is legally sufficient for submission to the people of Oklahoma.
STATE QUESTION NO. 807, INITIATIVE PETITION NO. 423 IS
LEGALLY SUFFICIENT FOR SUBMISSION TO THE PEOPLE OF
OKLAHOMA
Â¶44 Gurich, C.J., Kauger, Winchester, Edmondson and Combs, JJ., concur;
Â¶45 Darby, V.C.J., Kane (by separate writing) and Rowe (by separate writing), JJ., dissent;
Â¶46 Colbert, J., not participating.
FOOTNOTES
[1] Title 34 O.S. Supp. 2015 Â§ 8(b) provides:
It shall be the duty of the Secretary of State to cause to be published, in at least one newspaper of general circulation in the state, a notice of such filing and the apparent sufficiency or insufficiency of the petition, and shall include notice that any citizen or citizens of the state may file a protest as to the constitutionality of the petition, by a written notice to the Supreme Court and to the proponent or Respondents filing the petition. Any such protest must be filed within ten (10) business days after publication. A copy of the protest shall be filed with the Secretary of State.
[2] U.S. Const. art. VI, cl. 2 provides:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.
[3] Okla. Const., art. 1, Â§ 1 reinforces the federal Supremacy Clause, and provides: "The State of Oklahoma is an inseparable part of the Federal Union, and the Constitution of the United States is the supreme law of the land."
[4] Respondents/Proponents Ryan Kiesel and Michelle Tilley's Brief in Response to Protest Challenging Constitutionality of Initiative Petition No. 423, February 18, 2020, p. 5.
[5] While the potential for such enforcement remains, the reality is that the Justice Department has shown little interest of late in using federal resources to enforce federal marijuana prohibitions in the states that have legalized its use. At his confirmation hearing, Attorney General William Bar noted: "[t]o the extent that people are complying with state laws on distribution and production, we're not going to go after that." Brian Tashman, What We Learned from William Barr's Confirmation Hearing, ACLU, Jan. 16, 2019, https://www.aclu.org/blog/civil-liberties/executive-branch/what-we-learned-william-barrs-confirmation-hearing. In each budget cycle since FY 2014, Congress has passed an appropriate rider preventing the Department of Justice from using taxpayer funds to prevent the states from "implementing their own laws that authorize the use, distribution, possession, or cultivation of marijuana. See Pub. L. No. 116-6, div. C, Section 537, 133 Stat. 138 (2019); United States v. McIntosh, 833 F.3d 1163, 1178 (9th Cir. 2016).
[6] Also, in People v. Crouse, 2017 CO 5, 388 P.3d 39, the Supreme Court of Colorado determined a specific provision of Colorado's medical marijuana scheme requiring law enforcement officers to return medical marijuana seized from an individual later acquitted of a state drug charge was preempted by the CSA because it would require state police officers to violate federal law. People concerns a distinct factual scenario not directly implicated by Petitioner's challenge to SQ 807.
[7] It should also be noted that one of the specific purposes of the CSA is to conquer drug abuse. See Gonzales, 545 U.S. at 12. Much of the excise tax revenue that would be collected if SQ 807 is adopted would be directed to programs specifically designed to combat drug abuse. That collection and funding effort would serve to aid one of the primary purposes of the CSA, not thwart it.
[8] Respondent's challenge Petitioner's standing to make such a claim, noting he has alleged no injury to his own interests. However, we need not consider that issue because Petitioner's challenge is to the legal sufficiency of SQ 807 and he is not seeking to invoke the private right of action created by 18 U.S.C. Â§ 1964.
Thus far, many attempts by private citizens to assert RICO violations by marijuana businesses have failed. See Ainsworth v. Owenby, 326 F.Supp.3d 1111 (D. Oregon 2018); Bokaie v. Green Earth Coffee LLC, 2018 WL 6813212 (N.D. Cali. 2018). But see Safe Streets Alliance v. Hickenlooper, 859 F.3d 865 (10th Cir. 2017). Of note, the Tenth Circuit in Safe Streets Alliance also concluded that the plaintiff organizations had failed to allege any viable substantive right to enforce the preemptive provisions of the CSA, thus implying that individuals may not possesses the option of challenging state marijuana laws in federal court as preempted by the CSA. See 859 F.3d at 901-04.
[9] As Petitioner notes in his response:
9. All elements of probable cause to bring criminal felony charges against state officials who promulgate IP 423, if it becomes article 31, Oklahoma Constitution, exist under [RICO].
Petitioner/Protestant's Brief in Response to Respondents/Respondents Ryan Kiesel and Michelle Tilley's Response, Â¶9.
[10] The Second Circuit Court of Appeals has indicated it is possible to seek prospective injunctive relief against a sovereign entity in a civil action pursuant to RICO. See Gingras v. Think Finance, Inc., 922 F.3d 112, 124-25 (2nd Cir. 2019). However, Petitioner is not seeking injunctive relief. He is arguing SQ 807 is facially unconstitutional because it would require the State to engage in criminal RICO violations. Gingras is thus not directly applicable.
[11] Title 21 U.S.C. Â§ 885(d) (2018) provides:
Except as provided in sections 2234 and 2235 of Title 18, no civil or criminal liability shall be imposed by virtue of this subchapter upon any duly authorized Federal officer lawfully engaged in the enforcement of this subchapter, or upon any duly authorized officer of any State, territory, political subdivision thereof, the District of Columbia, or any possession of the United States, who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances.
In Smith v. Superior Ct., 239 Cal.Rptr.3d. 256, 260 (Cal. App. Dep't Super. Ct. 2018), a California appellate court applied Section 885(d) and concluded the San Francisco Police Department was immune from federal prosecution under the CSA when complying with California law for the return of marijuana lawfully possessed under California law. But see People v. Crouse, 2017 CO 5, Â¶8, 388 P.3d 39 (holding state law return provision to be preempted by the CSA because an officer could not be "lawfully engaged" in enforcement activities under state law if state law required violation of federal law).
[12] Petitioner states:
State Question 807 would create a state-sponsored agency specifically to engage in criminal felony RICO money laundering, by excise sales taxing cannabis purchases and creating a trust fund to funnel excise sales tax receipts to other agencies and private non-profit entities.
Protest to Challenge the Constitutionality of State Question 907, Petitioner Number 423, Â¶9.
[13] Specifically, 26 U.S.C. Â§ 280E (2018) provides:
No deduction or credit shall be allowed for any amount paid or incurred during the taxable year in carrying on any trade or business if such trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances (within the meaning of schedule I and II of the Controlled Substances Act) which is prohibited by Federal law or the law of any State in which such trade or business is conducted.
[14] Though Respondents discuss the potential application of other federal statutes, such as 18 U.S.C. Â§Â§ 1956 & 1957 (2018) (money laundering) and 18 U.S.C. Â§ 1960 (2018) (prohibition of unlicensed money transmitting business), those statutes are not discussed by Petitioner in his filings.

Kane, J., with whom Darby, J. joins, dissenting:
Â¶1 A growing number of states wish to differ with the federal government as to the regulation of marijuana. Before us is an attempt to have Oklahoma join these states. The majority finds the petition is legally sufficient for submission to the people, but I find the proposed measure stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress and is, therefore, preempted by the Controlled Substances Act (CSA).[1] I also part with the majority's reliance on the anticommandeering doctrine in support of their conclusion that the proposed measure is not preempted by the CSA. I therefore dissent.
Â¶2 Our preemption analysis begins with the assumption that the historic police powers of the states are not superseded by federal law unless that is the clear and manifest purpose of Congress. See Altria Group, Inc. v. Good, 555 U.S. 70, 77 (2008). Section 903 of the CSA sets forth Congress's clear and manifest purpose to preempt state law, specifically when "there is a positive conflict between [a provision of the CSA and a state law] so that the two cannot consistently stand together." 21 U.S.C.A. Â§ 903 (current through P.L. 116-142). Such "positive conflict" exists either when it is physically impossible to comply with both state and federal law or when state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985) (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). The United States Supreme Court has previously found when state law authorizes conduct that federal law forbids, it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. See Mich. Canners & Freezers Ass'n v. Agric. Mktg. and Bargaining Bd., 467 U.S. 461, 478 (1984) (citing Hines, 312 U.S. at 67).
Â¶3 We next look to the purposes and objectives of Congress in the CSA. The United States Supreme Court has determined:
The main objectives of the CSA were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances. Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.
To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. The CSA categorizes all controlled substances into five schedules. The drugs are grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body.
Gonzales v. Raich, 545 U.S. 1, 12-13 (2005) (footnotes and citations omitted). Congress has continued to classify marijuana as a Schedule I drug despite extensive efforts to have it unclassified or reclassified. See 21 U.S.C.A. Â§ 812(c)(10) (current through P.L. 116-142). Marijuana is classified as a Schedule I drug based on Congress's belief that marijuana has high potential for abuse, there is no accepted medical use, and there is a lack of accepted safety for use under medical supervision. See id. Â§ 812(b)(1)(A)-(C). Federal law prohibits all production, sale, and use of marijuana.[2] State Question 807 authorizes the widespread production, sale, and use of marijuana. The proposed measure affirmatively authorizes conduct the CSA expressly forbids. This clearly presents an obstacle to the accomplishment and execution of the full purposes and objectives of Congress and is preempted.
Â¶4 The majority leans on this notion that state law immunity would not frustrate the CSA's goals of conquering drug abuse or controlling drug traffic because, if SQ 807 is approved, Oklahoma would "simply be parting ways with Congress on the scope of acceptable marijuana use." This notion of "scope of acceptable use" comes from decisions on the legalization of medical marijuana, not recreational marijuana. See Reed-Kaliher v. Hoggat, 347 P.3d 136, 141-142 (Ariz. 2015); Ter Beek v. City of Wyoming, 846 N.W.2d 531, 539 (Mich. 2014). Congress is clear that there is no acceptable use of marijuana. The proposed measure makes the scope of acceptable use extremely broad, permitting use by anyone 21 years of age or older. This "parting of ways" leaves a gaping hole between Congress's scope of acceptable use (none) and Oklahoma's (anyone 21 or older). If that is not "a positive conflict" between the CSA and Oklahoma law "so that the two cannot consistently stand together," then what is? The majority's decision makes the already narrow preemption provision in 21 U.S.C.A. Â§ 903 a complete nullity.
Â¶5 Some clarification as to preemption and the anticommandeering doctrine is warranted. The analysis employed by the majority blends consideration of obstacle preemption with the anticommandeering doctrine and Murphy v. National Collegiate Athletic Association, __ U.S. __, 138 S. Ct. 1461 (2018), to bolster its holding. Preemption is based on the Supremacy Clause and means that when federal and state law conflict, federal law prevails and state law is preempted. See id. at 1476. "[E]very form of preemption is based on a federal law that regulates the conduct of private actors, not the States." Murphy, 138 S. Ct. at 1481 (emphasis added). The anticommandeering doctrine is based on the Tenth Amendment and is a limit to Congress's legislative powers. See id. at 1476. Congress does not have the power to issue direct orders to the governments of the states. Id. In Murphy, the United States Supreme Court found there was no federal preemption provision in PAPSA because PAPSA regulates states, not private actors. Id. at 1481. The Murphy Court then found "there is simply no way to understand the provision prohibiting state authorization as anything other than a direct command to the States. And that is exactly what the anticommandeering rule does not allow." Murphy, 138 S. Ct. at 1481 (emphasis added).
Â¶6 In sum, preemption is implicated when federal law regulates private actors; the anticommandeering doctrine is implicated when federal law regulates the states. In Murphy, the Supreme Court found preemption was not implicated. Rather, the PAPSA provision regulated the states and violated the anticommandeering doctrine. The Supreme Court did not find the PAPSA provision regulated private conduct and that the state law did not stand as an obstacle to the purposes of PAPSA and, therefore, was not preempted. That is an important distinction. Because the United States Supreme Court found preemption was not implicated in Murphy, they did not undergo an obstacle preemption analysis. As a result, Murphy cannot support the majority's holding that SQ 807 does not stand as an obstacle to the purposes of the CSA and, therefore, is not preempted. Here, there is no question the CSA regulates the conduct of private actors and that Â§ 903 of the CSA is a preemption provision. Therefore, the only inquiry is whether the proposed state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the CSA (not whether the CSA violates the anticommandeering statute).[3] 
Â 
Â¶7 Furthermore, any suggestion that this Court should find SQ 807 is not preempted because the federal government is aware of the widespread state legalization of medical and/or recreational marijuana but has declined to enforce the CSA is irrelevant. Congress creates federal laws. The executive branch is responsible for enforcing those laws. This branch is charged with interpreting the laws in a way that gives effect to the intent of Congress. Congressional intent is clear: the production, sale, and use of marijuana for any purpose is prohibited, and any state law that permits such acts is preempted. Despite a shift in public opinion and many states legalizing medical and/or recreational marijuana, Congress has continued to classify marijuana as a Schedule I drug and prohibit all production, sale, and use of it. In Emerald Steel Fabricators, Inc. v. Bureau of Labor and Industries, 230 P.3d 518, 533 (Or. 2010), the Supreme Court of Oregon aptly noted "whatever the wisdom of Congress's policy choice to categorize marijuana as a Schedule I drug, the Supremacy Clause requires that we respect that choice when, as in this case, state law stands as an obstacle to the accomplishment of the full purposes of the federal law."
Â¶8 I respectfully dissent.
FOOTNOTES
[1] I have no issue with the majority's conclusion that compliance with both federal and state law is not physically impossible.
[2] The sole exception is using marijuana as part of a Food and Drug Administration preapproved research study. See Gonzales v. Raich, 545 U.S. 1, 14 (2005) (citing 21 U.S.C. Â§ 823(f)).
[3] In fact, the CSA does not violate the anticommandeering doctrine. The CSA regulates the conduct of private actors, not the States. Therefore, the CSA does not implicate the anticommandeering doctrine.

Rowe, J., with whom Darby, VCJ., joins, dissenting:
Â¶1 I dissent from the Court's opinion holding that State Question No. 807, Initiative Petition No. 423 ("SQ 807") is not preempted by federal law and legally sufficient for submission to the people of Oklahoma.
Â¶2 The Controlled Substances Act ("CSA"), 21 U.S.C. Â§Â§ 801-904, which governs the use and trafficking of controlled substances, explicitly addresses the issue of federal preemption of state law:
No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.
21 U.S.C. Â§ 903. As the Court notes in its opinion, a "positive conflict" arises either when it is impossible to comply with both federal and state law, or where state law stands as an obstacle to the accomplishment and execution of Congress's full purposes and objectives. See Hillsborough City, Fla. v. Automated Med Labs, Inc., 471 U.S. 707, 713 (1985).
Â¶3 The Court correctly concludes that the proposed constitutional amendments in SQ 807 contain no mandate that would require Oklahomans to violate the provisions of the CSA. However, passage of SQ 807 would clearly present an obstacle to the accomplishment and execution of Congress's full purposes and objections, expressed in the CSA. The purpose of the CSA was "to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." Gonzalez v. Raich, 545 U.S. 1, 12 (2005). Marijuana is considered a Schedule I controlled substance under the CSA. 21 C.F.R. Â§ 1308.11(d)(23). It is illegal for any person to manufacture, distribute, or dispense marijuana and also illegal for any person to possess marijuana with the intent to manufacture, distribute, or dispense it. 21 U.S.C. Â§Â§ 841(a)(1), 844(a).
Â¶4 If SQ 807's proposed amendments become law, there will unquestionably be a proliferation in the cultivation, manufacture, distribution, dispensation, and recreational use of marijuana in Oklahoma. These outcomes are hardly hypothetical. In a world where these activities are sanctioned and licensed by the State of Oklahoma, it will become virtually impossible for federal law enforcement, operating with limited resources, to accomplish Congress's objective in the CSA to control the production, sale, and use of controlled substances.
Â¶5 Contrary to the Court's analysis, reading the CSA as preempting state laws which legalize and regulate trafficking in marijuana would not run afoul of the anti-commandeering doctrine. The anti-commandeering doctrine operates as a limit on federal preemption. "We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power to directly compel the States to require or prohibit those acts." Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. 1461, 1477 (2018) (quotation omitted). The CSA contains no direct mandate for the states to adopt drug enforcement regulations which mirror its provisions; the CSA merely prohibits certain conduct on behalf of individuals. Congress anticipated that states would adopt regulatory schemes that are generally complementary to federal law, even if not perfectly consistent with the CSA. Sanctioning activity that is proscribed by federal law, however, is in no sense complementary.
Â¶6 The Court likens the question before us to that addressed by the United States Supreme Court in Murphy v. National Collegiate Athletic Association, where the Court invalidated a federal law, the Professional Amateur Sports Protection Act (PASPA), that prohibited states from authorizing or licensing gambling on sporting events. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. at 1470. The Court found that PASPA violated the anti-commandeering doctrine because it "unequivocally dictate[d] what a state legislature may and may not do." Id. at 1478. PASPA, however, is distinguishable from the CSA in a number of important ways. First, PASPA did not make sports gambling a federal crime. Id. at 1471. This meant that the burden of enforcing its provisions would fall exclusively on state government, thus conscripting state law enforcement for federal purposes. Id. Second, and most importantly, the CSA does not contain any provisions unequivocally dictating what a state legislature may and may not do.
Â¶7 SQ 807's proposed constitutional amendments clearly present a substantial obstacle to Congress's objectives expressed in the CSA to control the production, sale, and use of controlled substances. Therefore, SQ 807 is preempted by federal law.
Â¶8 Accordingly, I respectfully dissent.
Â